# NEW HAVEN INCLUSION CASES*

Argued March 30, 1970—Decided June 29, 1970

---

*No. 915, *New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee* v. *United States et al.*, No. 917, *Manufacturers Hanover Trust Co., Trustee* v. *United States et al.*, and No. 921, *Chase Manhattan Bank, N. A., Trustee* v. *United States et al.*, on appeal from the United States District Court for the Southern District of New York. No. 914, *New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee* v. *Smith, Trustee, et al.*, No. 916, *Manufacturers Hanover Trust Co., Trustee* v. *United States et al.*, No. 920, *Chase Manhattan Bank, N. A., Trustee* v. *Penn Central Co. et al.*, No. 1038, *Penn Central Co.* v. *Manufacturers Hanover Trust Co., Trustee, et al.*, and No. 1057, *United States et al.* v. *New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee et al.*, on certiorari to the United States Court of Appeals for the Second Circuit in advance of judgment.

396

*Whitney North Seymour* argued the cause for Manufacturers Hanover Trust Co. With him on the brief were *Horace J. McAfee* and *Albert X. Bader, Jr. Lester C. Migdal* argued the cause for New York, New Haven & Hartford Railroad Co. First Mortgage 4% Bondholders Committee. With him on the briefs was *Lawrence W. Pollack. Joseph Auerbach* argued the cause for Smith, Trustee of the property of New York, New Haven & Hartford Railroad Co. With him on the briefs were *James Wm. Moore, Robert G. Bleakney, Jr.,* and *Morris Raker. Leonard S. Goodman* argued the cause for the United States et al. With him on the brief were *Solicitor General Griswold, Assistant Attorney General McLaren, Deputy Solicitor General Springer, John H. D. Wigger,* and *Robert W. Ginnane. Hugh B. Cox* argued the cause for Penn Central Transportation Co. With him on the brief were *Roswell B. Perkins, Ulrich Schweitzer, Samuel E. Gates, Robert L. King,* and *Harvey J. Goldschmid. Joseph Schreiber* and *Wilkie Bushby* filed briefs for the Chase Manhattan Bank, N. A. *Louis J. Lefkowitz,* Attorney General, *Dunton F. Tynan,* Assistant Solicitor General, and *Walter J. Myskowski* filed a brief for the State of New York. *Robert K. Killian,* Attorney General, *Samuel Kanell,* Special Assistant Attorney General, and *Jack Rubin,* Assistant Attorney General, filed a brief for the State of Connecticut. *Herbert F. De Simone,* Attorney General of Rhode Island, and *W. Slater Allen, Jr.,* Special Assistant Attorney General, joined in the briefs for the States of New York and Connecticut.

MR. JUSTICE STEWART delivered the opinion of the Court.

These cases represent the latest stage of the litigation arising from the merger of the Pennsylvania and New York Central railroads, which we upheld two Terms ago in the *Penn-Central Merger Cases,* 389 U. S. 486. A con-

dition of that merger was Penn Central's promise to take in the New York, New Haven & Hartford Railroad Company as an operating entity—a promise that Penn Central fulfilled on December 31, 1968, 11 months after its own formation. The ultimate question presented by the cases now before us is the price Penn Central must pay for the assets of the New Haven.†

I

1. *The Penn Central.* The proposed combination of the Pennsylvania and New York Central railroads first came under consideration by the parties and the Interstate Commerce Commission more than 12 years ago, a decade prior to its eventual consummation.[1] The two railroads formally sought permission to merge under the Interstate Commerce Act, 49 U. S. C. § 1 *et seq.,* on March 9, 1962.[2] On April 6, 1966, the Commission authorized the merger of the two roads.[3] The union of the two carriers was the largest railroad merger in the history of the Nation,[4] bringing together the companies that "dominate rail transportation in the Northeast." [5] In 1965 the component roads enjoyed a total operating revenue in excess of $1,500,000,000 and a net annual income of over $75,000,000.[6] The two companies held

---

†On June 21, 1970, the Penn Central Transportation Company filed a petition for reorganization under § 77 of the Bankruptcy Act, 11 U. S. C. § 205, in the United States District Court for the Eastern District of Pennsylvania. Whether the financial obligations dealt with in the present opinion may become subject to modification in or because of those proceedings is a question with which the present opinion in no way deals.

[1] See *Penn-Central Merger Cases,* 389 U. S., at 494; *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S. 372, 379.

[2] *Pennsylvania R. Co.—Merger—New York Central R. Co.,* 327 I. C. C. 475, 479 ("*Merger Report*").

[3] *Ibid.*

[4] *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S., at 392.

[5] *Penn-Central Merger Cases,* 389 U. S., at 493.

[6] *Ibid.*

some $72,000,000 in working capital and $1,242,000,000 in combined investments.[7] With about 19,600 miles of road "sprawling between the Great Lakes on the north . . . and the Ohio and Potomac Rivers on the south,"[8] Penn Central was at its inception nearly twice the size of the next largest railroad system in the East and three times that of the third largest.[9]

The predicted economies effected by the merger were likewise enormous; it was thought that within about eight years of the combination they would exceed $80,000,000 annually.[10] Those savings represented a value, capitalized at 8%, of $1,000,000,000.

On June 9, 1967, after considerable litigation involving protective conditions for various affected railroad competitors,[11] the Commission issued a modified order author-

---

[7] *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S., at 380.

[8] *Merger Report,* 327 I. C. C., at 489.

[9] *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S., at 447 (separate opinion of DOUGLAS, J.).

[10] *Penn-Central Merger Cases,* 389 U. S., at 493; *Merger Report,* 327 I. C. C., at 501.

[11] As part of its initial merger order, the Commission had prescribed special traffic and indemnity provisions for the benefit of the Delaware & Hudson, Boston & Maine, and Erie-Lackawanna railroads. The Commission had not yet determined whether those three "protected carriers" should be included in either Penn Central or the recently formed Norfolk & Western, but concluded they required sheltering conditions if they were to survive the interim period pending decision as to their ultimate disposition. *Merger Report,* 327 I. C. C., at 531–532. On September 16, 1966, following objections to the initial order from various parties, the Commission abrogated the indemnity provisions originally prescribed for the protected carriers and announced it would reconsider its earlier decision, with possible modifications to be given retroactive effect. *Pennsylvania R. Co.—Merger—New York Central R. Co.,* 328 I. C. C. 304 (*"Reconsideration Report"*). On October 4, 1966, a three-judge District Court in the Southern District of New York declined, one judge dissenting, to enjoin enforcement of the Commission's order. *Erie-Lackawanna R. Co.* v. *United States,*

izing the Penn-Central merger.[12]   On October 19, 1967, a court of three judges, convened in the United States District Court for the Southern District of New York to review the Commission's order pursuant to 28 U. S. C. §§ 1336, 2284, and 2321–2325, upheld the Commission's action.[13]   On January 15, 1968, this Court affirmed with minor modifications, and thereby sustained the validity of the merger.[14]   Two weeks later, on February 1, 1968, Pennsylvania and New York Central merged.

2. *The New Haven.*   The New York, New Haven & Hartford Railroad is now an operating division of the Penn Central system.   At the time of the merger, however, it was an independent Class I railroad operating some 1,500 miles of line in the Commonwealth of Massachusetts and the States of Rhode Island, Connecticut, and New York; as such, it was the sixth largest railroad in the northeast region and the largest in New England.[15] With an operations area extending from Boston to New York and connecting with nine other Class I railroads, the New Haven served 12 cities of greater than 100,000 population, as well as a number of important defense

259 F. Supp. 964.   Later, the District Court denied injunctive relief sought by bondholders of the New Haven railroad.   *Oscar Gruss & Son* v. *United States,* 261 F. Supp. 386.   On March 27, 1967, this Court reversed and remanded *Erie-Lackawanna* with instructions that the Commission complete its proceedings relating to the protected roads.   *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S. 372. We later vacated and remanded *Oscar Gruss* for reconsideration in light of *Baltimore & Ohio,* 386 U. S. 776.   Ensuing developments are recounted in the text.

[12] *Pennsylvania R. Co.—Merger—New York Central R. Co.,* 330 I. C. C. 328 (*"First Supplemental Report"*).

[13] *Erie-Lackawanna R. Co.* v. *United States,* 279 F. Supp. 316.

[14] *Penn-Central Merger Cases,* 389 U. S. 486.

[15] *Baltimore & Ohio R. Co.* v. *United States,* 386 U. S., at 381; *New York, N. H. & H. R. Co. Trustees Discontinuance of Passenger Service,* 327 I. C. C. 77, 79–80 (*"Suburban Discontinuance Case"*).

402

establishments.[16]   In 1964 the railroad employed about
9,800 people and paid them annual wages amounting to
$70,000,000.[17]   About 30,000 commuters used the line
every day to reach work in New York City alone.[18]   As
described by the Commission,

> "The New Haven has both a large passenger and
> freight business.  It is the fourth largest passenger
> carrying railroad in the United States, and has the
> second highest commuter revenue of all such
> roads. . . .   The volume of its freight business . . .
> is substantially greater . . . .   It is the largest
> freight railroad in New England and ranks tenth in
> freight traffic among all railroads in the eastern dis-
> trict. . . .   Its freight service is considered to be of
> extreme importance to the industrial well-being of
> southern New England." [19]

The financial history of the New Haven was for dec-
ades a history of extreme vicissitudes.  The company's
decline and fall, with passage into, out of, and back into
railroad reorganization, have been chronicled elsewhere.[20]
It first went into reorganization under § 77 of the Bank-
ruptcy Act, 11 U. S. C. § 205, on October 23, 1935.  Due

[16] *New York, N. H. & H. R. Co., Trustees, Discontinuance of All
Interstate Passenger Trains,* 327 I. C. C. 151, 163 *("Interstate Dis-
continuance Case").*

[17] *Id.,* at 163–164.

[18] *Id.,* at 169.

[19] *Suburban Discontinuance Case,* 327 I. C. C., at 80.

[20] See generally *Baltimore & Ohio R. Co.* v. *United States,* 386
U. S., at 452–454 (separate opinion of DOUGLAS, J.); L. Brandeis,
Financial Condition of the New York, New Haven & Hartford
Railroad Company and of the Boston & Maine Railroad (1907);
L. Brandeis, Other People's Money 129–136 (1933); Report of the
Joint New England Railroad Committee to the Governors of the
New England States 53–73 (1923); E. Sunderland, A Brief History
of the Reorganization of The New York, New Haven and Hartford
Railroad Company 1–5 (1948); Capture of the New Haven, Fortune
Magazine, April 1949, p. 86 *et seq.*

in large measure to the difficulties of including formerly leased lines in the reorganized road, nearly 12 years elapsed from the filing of the debtor's petition in the United States District Court for the District of Connecticut to that court's eventual order approving consummation of the Commission's plan of reorganization.[21]

The railroad emerged from reorganization in 1947 with a vastly simplified debt structure in which only the most senior holders of secured interests survived.[22] But in the following years the financial condition of the company again deteriorated, prompting it to seek at first partial and then total discontinuance of passenger service on the former Old Colony lines in Massachusetts.[23] By 1959 the financial condition of the New Haven was such as to render the chance of surplus earnings "slight at best."[24] Through late 1960 and into early 1961 the company's management expended great efforts to stave off bankruptcy by obtaining loans or grants from the Federal and State Governments.[25] By the middle of 1961, current liabilities exceeded current assets by $36,310,000,[26] and the company was losing cash at the annual rate of $18,000,000.[27]

Finally, on July 7, 1961, the New Haven again petitioned for reorganization under § 77 in the United States

---

[21] See In re New York, N. H. & H. R. Co., 169 F. 2d 337, 338 n. 6, cert. denied sub nom. Mulcahy v. New York, N. H. & H. R. Co., 335 U. S. 867.

[22] See In re New York, N. H. & H. R. Co., 378 F. 2d 635, 640.

[23] Commission of Department of Public Utilities v. New York, N. H. & H. R. Co., 178 F. 2d 559, cert. denied, 339 U. S. 943; In re New York, N. H. & H. R. Co., 163 F. Supp. 59.

[24] In re New York, N. H. & H. R. Co., 278 F. Supp. 592, 606, aff'd, 405 F. 2d 50, cert. denied sub nom. Abex Corp. v. Trustees, 394 U. S. 999.

[25] 278 F. Supp., at 606.

[26] Id., at 601.

[27] In re New York, N. H. & H. R. Co., 289 F. Supp. 451, 456; In re New York, N. H. & H. R. Co., 281 F. Supp. 65.

District Court for the District of Connecticut, a step that the court was later to find had been far too long delayed:

"[I]n the interest of its creditors, its employees and the public [the railroad] should have petitioned . . . long before it did. The grave problems which . . . beset the reorganization would have been much less acute and infinitely more manageable if bankruptcy had not been put off until its cash was almost entirely depleted, credit was practically gone, maintenance was down and in all other respects the bottom was out of the barrel." [28]

Immediately upon their taking over the New Haven, the trustees appointed by the reorganization court were obliged to borrow $8,000,000 to meet the payroll.[29] The situation did not improve with the passage of time. "[I]n spite of spartan economies and a sizeable reduction in numbers of employees, the costs of operation . . . offset savings and eroded away the accumulated cash." [30] On July 6, 1964, the New Haven trustees petitioned the Commission, pursuant to § 13a (2) of the Interstate Commerce Act, 49 U. S. C. § 13a (2), for authority to discontinue suburban passenger train service in the Boston area. There followed a public hearing, an adjournment to afford Massachusetts authorities an opportunity—ultimately unavailing—to negotiate a contract with New Haven for continuation of some service, and a motion by the New Haven for expedited disposition "by reason of the critical nature of New Haven's finances, the irretrievable drain which the operations in question impose upon New Haven's resources, and the increasing adverse effect which New Haven's situation has upon

[28] *In re New York, N. H. & H. R. Co.*, 278 F. Supp., at 606.
[29] *In re New York, N. H. & H. R. Co.*, 405 F. 2d, at 52.
[30] *In re New York, N. H. & H. R. Co.*, 281 F. Supp., at 65–66.

the public interest and upon New Haven's creditors . . . ."
The Commission granted the trustees' application, concluding that for a period beginning four years before the 1961 reorganization petition and continuing thereafter, New Haven's financial condition had been "critical" and "drastically weak . . . ." [31]

By 1965 it was evident that the New Haven was on the verge of collapse.[32] Its year-end current assets amounted to $20,521,000, some $16,685,000 less than current liabilities plus long-term debt payments due within the coming year. The obligations payable after one year totaled $189,042,000. The retained income account showed a deficit of $81,672,000; the working capital account, a deficit of $16,700,000. For the year the net railway operating income showed a deficit of $16,000,000, with overall net income a deficit only $1,000,000 less. The company was in default in its payments of both principal and interest on its long-term debt.[33] In the view of the trustees, New Haven was

---

[31] *Suburban Discontinuance Case*, 327 I. C. C., at 79, 80, 106.

[32] By this time the railroad's freight operations were also operating at deficit levels. The Commission explained this aspect of the problem as follows:

"Southern New England is a deficit area in terms of food, fuel, and the raw materials for industry. Accordingly, in serving this economy, the New Haven is a short haul railroad with a heavily unbalanced flow of traffic and equipment. As a terminal railroad it faces the constant problems and added costs of switching and deadheading foreign line freight cars to move them back off its own lines. Moreover, as a result of national and regional economic and industrial shifts, New England's outbound products have become increasingly high-value and light-weight in character. With the expansion in the region of a modern, comprehensive highway system during the past 20 years, this outbound freight traffic has become especially susceptible to diversion from rail to private and for-hire trucking service." *Interstate Discontinuance Case*, 327 I. C. C., at 170.

[33] *Id.*, at 164.

"absolutely faced with economic obsolescence if it continues as an independent, short-line, terminal railroad."[34]

On October 11, 1965, the New Haven notified the Commission, pursuant to § 13a (1) of the Interstate Commerce Act, 49 U. S. C. § 13a (1), of its intention to discontinue all its interstate passenger trains effective March 1, 1966.[35] If carried into effect, the proposed discontinuance would have drastically curtailed passenger train service in New York and Massachuetts, and ended it completely in Connecticut and Rhode Island.[36] In the spring of 1966 the Commission, noting that over an 11-year period New Haven had experienced "an unending succession of reverses," concluded that "[t]here now is totally lacking any hope or plan for future survival of this carrier, except that held out by its merger into a trunkline railroad."[37] The Commission acceded in part to the trustees' notice of discontinuance, but invoked its statutory power to keep many of the trains in operation on the ground that "passenger as well as freight service by the N[ew] H[aven] is a national necessity and that termination of either would lead to distress in Connecticut, Massachusetts, and Rhode Island, and would severely damage New York City and the Nation generally."[38]

As 1966 gave way to 1967, the New Haven's situation deteriorated still further. As of April 1967 the reorganization court thought "the prospect for the continued operation of the Railroad was very dim."[39] The road lacked even a current expense fund from which to satisfy the "six months" creditors, and the court thought it

---

[34] See id., at 175.

[35] See Merger Report, 327 I. C. C., at 488.

[36] Interstate Discontinuance Case, 327 I. C. C., at 152.

[37] Id., at 172, 173.

[38] Penn-Central Merger Cases, 389 U. S., at 507.

[39] In re New York, N. H. & H. R. Co., 281 F. Supp. 65.

"highly unlikely that there ever will be one." [40]  In July 1967 the reorganization court found that the New Haven's situation had become "desperately critical"; its cash depletion was "so serious that, if the present rate of loss continues, there will be insufficient left by late September to meet the payroll of approximately $1,400,000 per week." [41]

As 1967 came to an end, so did the New Haven's cash reserve. By August 31 the cash balance fell to $4,500,000—a precarious condition for a company requiring $1,750,000 a week simply to meet current operating expenses. [42]  The trustees estimated that as of December 31, 1967, the balance would decline to $3,100,000 and two months later would fall to $850,000. [43]  The New Haven's financial position had thus eroded to the point where its shutdown was "imminent . . . ." [44]

---

[40] *In re New York, N. H. & H. R. Co.*, 278 F. Supp., at 602.

[41] See *Erie-Lackawanna R. Co.* v. *United States*, 279 F. Supp., at 333. The three-judge court, writing in October 1967, expressed full agreement with these findings:

"No one has contested the forecast of the NH Trustees that their cash will run out at the end of 1967; no one has indicated any probable source of funds for that beleaguered property other than the merged Penn-Central. . . . For our part we are unwilling to take responsibility for such devastating hardship as even a temporary cessation of NH's operations would bring to New England and New York and in a lesser degree to other sections of the country when in our view there is no reason why the merger should not proceed; indeed we believe we have no right to do so. . . ." 279 F. Supp., at 355. "[W]ith the situation now so serious, there can hardly be doubt that it is better to accept what is good for the New Haven than permit the patient to die while in quest of the best." *Id.*, at 335.

[42] *Pennsylvania R. Co.—Merger—New York Central R. Co.*, 331 I. C. C. 643, 651 (*"Second Supplemental Report"*).

[43] *Ibid.*

[44] *Id.*, at 653.

3. *The inclusion negotiations.* From the outset of the § 77 proceeding in 1961, the trustees of the New Haven and the reorganization court charged with conservation of the debtor's dwindling assets recognized that "a merger with a large trunk line railroad would be the most promising and feasible means of continuing the viability of the New Haven's transportation system . . . ." *In re New York, N. H. & H. R. Co.,* 289 F. Supp. 451, 456; cf. 281 F. Supp. 65. After Pennsylvania and New York Central filed their merger application before the Interstate Commerce Commission in 1962, the New Haven trustees sought inclusion in the new company, both by private negotiations with the component roads and by a petition to the Commission filed June 26, 1962. See *In re New York, N. H. & H. R. Co.,* 378 F. 2d 635, 636; *Merger Report,* 327 I. C. C. 475, 480. As the reorganization court said, it was "apparent that the inclusion of the New Haven in the Penn-Central merger was the only salvation for the New Haven as an operating railroad . . . ." *In re New York, N. H. & H. R. Co.,* 289 F. Supp., at 456; see also *In re New York, N. H. & H. R. Co.,* 304 F. Supp. 793, 800.

The Commission, as we have noted, authorized the merger of the two roads in 1966. But in so doing, it found that "[w]ithout some radical change in circumstances, even if this merger application were denied, N[ew] H[aven] would face a nearly insuperable task in bringing itself out of bankruptcy." *Merger Report,* 327 I. C. C., at 522. The Commission concluded that the proposed Penn-Central combination, "without complete inclusion of N[ew] H[aven], would not be consistent with the public interest . . . ." *Id.,* at 524. Accordingly, it required "all the New Haven railroad to be included in the applicants' transaction," and conditioned its approval of the merger upon that inclusion, *id.,* at 524, 527. In so doing, the Commission spelled out Penn

Central's obligation toward New Haven in unequivocal language. Condition 8 of the Merger Report stipulated as follows:

"The Pennsylvania New York Central Transportation Company shall be required to include in the transaction all the New York, New Haven and Hartford Railroad Company . . . upon such fair and equitable terms as the parties may agree subject to the approval of the Bankruptcy Court and the Commission. Within 6 months after the date this report is served, the parties shall file with the Commission for its approval, a plan for such inclusion. In the event the parties are unable to reach an agreement (and subject to approval by the Bankruptcy Court) such inclusion shall be upon such fair and equitable terms and conditions as the Commission may impose.

.        .        .        .        .

"Jurisdiction is hereby reserved for such purposes. Consummation of the merger by applicants shall indicate their full and complete assent to these requirements." 327 I. C. C., at 553.

Condition 16 of the Merger Report reiterated that

"Consummation of the transaction approved herein shall constitute on the part of The Pennsylvania Railroad Company and the New York Central Railroad Company, their successors and assigns, acquiescence in and assent to the conditions stated in this appendix and in the attached report." *Id.,* at 555.

Having determined to require the inclusion of New Haven in Penn Central as a condition of merger, the Commission remitted the parties to private negotiation of the terms of inclusion. *Id.,* at 527. The New Haven trustees on the one side, and the Pennsylvania and New

York Central railroads on the other, had already been bargaining for some time, having drafted preliminary documents, dated December 22, 1964, and February 5, 1965, that provided for Penn Central's assumption of New Haven's freight operations. *Oscar Gruss & Son* v. *United States,* 261 F. Supp. 386, 393; *Interstate Discontinuance Case,* 327 I. C. C. 151, 175 n. 6. On April 21, 1966, two weeks after the Merger Report, they executed a Purchase Agreement for the transfer of substantially all the New Haven assets to Penn Central. *Penn-Central Merger Cases,* 389 U. S., at 508; see *In re New York, N. H. & H. R. Co.,* 378 F. 2d, at 636.[45] The Purchase Agreement provided for the transfer of the New Haven properties to Penn Central, with the consideration in exchange to consist in part of cash and in part of stocks and bonds of Penn Central.[46]

---

[45] The transfer was to be free and clear of all liens and encumbrances, with certain minor exceptions. The liens and encumbrances would shift to the proceeds of the sale and thus remain an obligation of the New Haven estate.

By negotiating a purchase and sale of the New Haven assets, the parties to the agreement elected not to attempt a recapitalization of New Haven, an enlarged merger that would bring New Haven into the Penn Central system as a corporate entity, or a lease of the New Haven operating assets. At one point, when it appeared the New Haven might not long survive, the Commission had directed the parties to negotiate a lease to be "immediately available upon consummation of the Penn-Central merger," but the negotiators reported they were unable to do so and instead suggested various loan-loss formulas. *Penn-Central Merger Cases,* 389 U. S., at 508; *Erie-Lackawanna R. Co.* v. *United States,* 279 F. Supp., at 334; *Second Supplemental Report,* 331 I. C. C., at 648.

[46] Subsequent modifications to the Agreement were executed October 4, 1966, and December 20, 1967.

The bondholders were not bound by the trustees' acceptance of the Purchase Agreement. The trustees acted on behalf of the debtor, subject to the directive of the reorganization court, but

In September 1966 the trustees filed a petition with the reorganization court reciting the background of the negotiations with Penn Central, the New Haven's large and growing deficits, and the insufficiency of internally generated cash to meet operating demands. In the trustees' view, inclusion in Penn Central afforded "the only practicable means for reorganization of the Debtor that is consistent with the best interest of the public and of all parties interested in the Debtor's estate . . . ." They submitted that operations should continue so long as inclusion was possible, and that the court should grant them leave to press for inclusion on the basis of the Purchase Agreement. *In re New York, N. H. & H. R. Co.*, 378 F. 2d, at 637. On October 24, 1966, the reor-

they never submitted the Agreement to that court for its approval. Moreover, they had stipulated with Pennsylvania and Central that they would not challenge the terms of the Purchase Agreement. The preliminary memoranda negotiated between the trustees and the two railroads contained a provision, substantially embodied in § 11.7 of the Agreement itself, that New Haven would not make or file

"any further statement, stipulation or other document in the pending Pennsylvania-Central merger proceedings before the I. C. C. . . . , or any judicial review thereof, other than in connection with (a) a position relating to the New Haven taken by any other party . . . , or (b) a failure of the I. C. C. to find either (i) that the New Haven should be included in such merger or (ii) that jurisdiction is to be retained by the I. C. C. for later determination of any petition by the New Haven for such inclusion, *provided, however,* that any such statement, stipulation or other document made or filed by the Trustees shall not be inconsistent with the provisions and intent of this Agreement."

The reorganization court suggested that the bondholders rather than the trustees press for early inclusion due to the impropriety of the trustees' taking "any action which would be or appear to be a repudiation of [the contract's] letter or spirit." See *Erie-Lackawanna R. Co.* v. *United States,* 279 F. Supp., at 333; and see *Oscar Gruss & Son* v. *United States,* 261 F. Supp., at 393–394.

ganization court authorized the trustees to present the Agreement to the Commission, noting that the goal of preserving the New Haven operations "has been the policy from the beginning of these proceedings . . . ." Three days later the trustees and the Pennsylvania and New York Central railroads petitioned the Commission for approval of the New Haven's inclusion on the terms of the Agreement.

On November 16, 1967, the Commission ratified the Purchase Agreement as the basis for the inclusion of New Haven in Penn Central. *Pennsylvania R. Co.— Merger—New York Central R. Co.*, 331 I. C. C. 643 *("Second Supplemental Report")*. It looked upon the fact that the parties had been able to reach agreement as an indication that even though the New Haven trustees were selling properties having no value as an operating entity, they nevertheless had enjoyed a degree of bargaining power by virtue of the requirement that Penn Central take in New Haven as a condition of the merger. 331 I. C. C., at 657. "[W]here a transaction is bargained at arm's length," said the Commission, "each side is presumably capable of determining its own best interest, and our primary function is to discover whether the transaction will be in the public interest." *Id.*, at 656. The Commission then undertook its independent analysis of the value of the New Haven properties. Although the Purchase Agreement "carrie[d] some probative force as to the values of the properties involved, it [was] by no means controlling." *Id.*, at 657. The Commission must still determine the price "on the basis of all the evidence pertaining thereto, not merely the agreement and supporting evidence." *Id.*, at 660 n. 12.

Upon its independent review of the record, the Commission found that the asset value of the New Haven properties to be transferred to Penn Central and of the

consideration to be given in exchange was $125,000,000. The Commission concluded that payment of that sum by Penn Central to the New Haven estate would be both "just and reasonable" as a condition of the merger under § 5 of the Interstate Commerce Act, and "fair and equitable" as part of a plan of reorganization under § 77 of the Bankruptcy Act. Unwilling to defer the merger until inclusion could take place but recognizing that the danger of an end to all New Haven operations was "very real," 331 I. C. C., at 654, the Commission authorized financial aid from Penn Central to prop up the debtor during the interim period between merger and inclusion to ensure New Haven's continued functioning until its acquisition by Penn Central. See *Penn-Central Merger Cases,* 389 U. S., at 509.

4. *The inclusion litigations.* At this juncture the Commission's determination of the terms of inclusion was subjected to simultaneous judicial review in two separate forums. On January 23, 1968, eight days after this Court's approval of the merger and eight days before the merger itself, the New Haven bondholders commenced five actions in the United States District Court for the Southern District of New York to set aside the Commission's order. The three-judge District Court reconvened to hear the actions and shortly thereafter consolidated the five cases into one. On March 29, 1968, the Commission certified the first step of its plan for the reorganization of the New Haven—the sale of its assets to Penn Central—to the reorganization court.[47] Pursuant

---

[47] The reorganization court had authorized the New Haven trustees to pursue a "two-step" plan before the Commission, in which the debtor's estate would sell its assets to Penn Central and then the trustees would file a specification of the terms to be accorded the security holders. In 1967, the Court of Appeals for the Second Circuit affirmed the District Court's authorization order with certain modifications not here pertinent, postponing consideration of the

to § 77 (e) of the Bankruptcy Act, 11 U. S. C. § 205 (e), the New Haven bondholders filed their objections to the Commission's plan following notice given by the reorganization court. Thus, the identical question of the price Penn Central would have to pay for the New Haven assets came at the same time before the three-judge District Court in New York and the single-judge District Court in Connecticut.

On July 10, 1968, the three-judge court, following extensive briefing and argument on the numerous issues underlying the price question, found itself unable to agree with the Commission in several major respects. It therefore vacated so much of the Commission's order as found the terms of Penn Central's acquisition of the New Haven's assets to be just and reasonable and remanded the cause for further proceedings. *New York, N. H. & H. R. Co., First Mortgage 4% Bondholders' Committee* v. *United States,* 289 F. Supp. 418. On August 13, 1968, also after extensive briefing and argument, the reorganization court independently returned the Commission's plan for further proceedings. *In re New York, N. H. & H. R. Co.,* 289 F. Supp. 451. On the overriding question of price, the two courts were in accord: by fixing the worth of the New Haven at $125,000,000, the Commission had substantially understated the value of the properties to be transferred. The

merits of the "two-step" plan because of the prematurity of the question as then presented. *In re New York, N. H. & H. R. Co.,* 378 F. 2d 635, 639. Pursuant to the plan of reorganization, the New Haven is to be reconstituted as a closed-end, nondiversified management investment company. See *Pennsylvania R. Co.— Merger—New York Central R. Co.,* 334 I. C. C. 25, 93 (*"Fourth Supplemental Report"*). The reorganization court has withheld disposition of the second or "distributive" step of the plan pending this Court's resolution of the question of price. *In re New York, N. H. & H. R. Co.,* 304 F. Supp. 1121, 1123–1124.

three-judge court estimated the understatement to be on the order of $45,000,000 to $50,000,000; the reorganization court, $33,000,000 to $55,000,000. 289 F. Supp., at 440, 465.

Meanwhile, the continuing drain on the New Haven's dwindling cash reserves called for—and received—drastic action. Upon remanding the Commission's proposed plan under § 77, the reorganization court ruled that unless the Commission ordered inclusion by January 1, 1969, the court would entertain a motion to dismiss the reorganization proceedings, resulting in termination of all the New Haven's train service. 289 F. Supp., at 459. The court recommended that the Commission direct the early inclusion of New Haven with a partial payment of the purchase price, deferring other issues to later resolution. *Id.*, at 466.

On the remand, the Commission reopened the record for the reception of further evidence and briefing in accordance with the instructions of the two reviewing courts. Its revaluation of the New Haven properties, announced on November 25, 1968, resulted in an increase in total worth of some $37,700,000, yielding a new price of $162,700,000 for the properties to be transferred. *Pennsylvania R. Co.—Merger—New York Central R. Co.*, 334 I. C. C. 25, 53 (*"Fourth Supplemental Report"*). But the Commission then invoked "other pricing considerations" not taken into account at the time of its prior report. Application of the new considerations effected a reduction of $22,081,000 from the newly calculated asset value, leaving a net value of $140,600,000—$15,600,000 more than the Commission's initial estimate, but $17,400,000 less than the lowest range of value suggested by either of the two District Courts. In addition, the Commission required Penn Central to pay $5,000,000 toward the New Haven's interim operating expenses and, yielding to the directive of the reorgani-

zation court, ordered Penn Central to take over the New Haven properties by January 1, 1969. 334 I. C. C., at 74, 76.

The Commission certified its revised plan to the reorganization court on December 2, 1968. Within three weeks the bondholders filed their objections. On December 24, 1968, the reorganization court released the assets of the debtor's estate to Penn Central without approving the price terms set by the Commission. The court reiterated that failure to include New Haven in Penn Central by January 1, 1969, would result in immediate termination of all New Haven train service. On December 31 the estate transferred its assets to Penn Central.

At once the bondholders pressed for judicial review of the Commission's revised evaluation. With their objections to the plan of reorganization already pending before the reorganization court, representatives of holders of the debtor's first and refunding mortgage 4% bonds commenced two separate actions against the United States and the Commission before the three-judge District Court in New York. The Manufacturers Hanover Trust Company and the Chase Manhattan Bank, trustees under other mortgage bonds, commenced two more actions against the same defendants.[48] The three-judge court consolidated the four cases and granted intervention—to the New Haven trustees as parties plaintiff and to Penn Central, the Commonwealth of Massachusetts, and the

---

[48] The United States Trust Company, as indenture trustee under the New Haven's Harlem River Division mortgage, had been one of the bondholder plaintiffs on the first round. At the suggestion of the reorganization court, 289 F. Supp., at 464, it received recognition of its secured status on the remand, when the Commission directed Penn Central to assume the Division bonds. 334 I. C. C., at 70. The trustee sought no further review.

States of Rhode Island, Connecticut, and New York as parties defendant.

On May 28, 1969, the reorganization court again rejected the plan submitted by the Commission. Although it accepted the Commission's determinations on some issues, the court overruled the Commission with respect to its valuation of the New Haven's Harlem River and Oak Point freight yards and its added deductions introduced for the first time on the remand. The court also instituted its own "underwriting" plan to ensure equivalent value for the estate with respect to the Penn Central common stock given in partial consideration for the transferred New Haven properties. *In re New York, N. H. & H. R. Co.,* 304 F. Supp. 793. An order implementing decision and remanding to the Commission was entered on July 28, 1969. 304 F. Supp. 1136.

On June 18, 1969, the three-judge court filed its opinion in the bondholders' action. With one judge in dissent, the court upheld the Commission's valuation of the freight yards and its added deductions on the remand. The court also adopted the underwriting plan devised by the reorganization court. *New York, N. H. & H. R. Co., First Mortgage 4% Bondholders' Committee* v. *United States,* 305 F. Supp. 1049. A decree fixing the terms of judgment followed on September 11, 1969.[49]

---

[49] In a *Fifth Supplemental Report,* decided July 10, 1969, and modified August 26, 1969, the Commission complied with the directive of the three-judge court to prepare and serve a proposed decree reflecting the changes ordered in that court's opinion of June 18, 1969. After making the required adjustments, the Commission ordered Penn Central to pay New Haven an additional $990,000 in stocks, bonds, and cash in the same relative percentages as provided in the *Fourth Supplemental Report.* In addition, the Commission called upon the parties to submit proposed terms of a detailed decree relating to the underwriting plan originated by the reorganization court and adopted by the three-judge court. 334 I. C. C. 528. The order of the Commission accompanying the

With the two District Courts thus in agreement, after two rounds of judicial review, on many of the substantial issues that had come before them, but in disagreement on matters amounting to more than $28,000,000 in value, the bondholders took direct appeals to this Court from the judgment of the three-judge court. They also appealed from the order of the reorganization court to the United States Court of Appeals for the Second Circuit. The United States, the Commission, and Penn Central took no appeals from the decree of the three-judge court but cross-appealed to the Court of Appeals from the order of the reorganization court. The Court of Appeals consolidated the appeals from the reorganization court, and the parties then petitioned this Court to grant certiorari to the Court of Appeals in advance of its judgment, pursuant to 28 U. S. C. §§ 1254 (1) and 2101 (e), and Rule 20 of this Court. We noted probable jurisdiction of the appeals from the order of the three-judge court and, with respect to the judgment of the reorganization court, granted certiorari to the Court of Appeals before judgment, accelerating briefing and argument to permit disposition of these cases at the current Term. 396 U. S. 1056.[50]

---

*Fifth Supplemental Report* does not appear to have undergone judicial review. At any rate, it is moot in light of the action we take today with respect to the judgments of the New York and Connecticut District Courts relating to the *Second* and *Fourth Supplemental Reports.*

[50] At the same time we affirmed the judgment of the three-judge court in No. 919, *Providence & Worcester Co.* v. *United States,* 396 U. S. 555, and denied certiorari in No. 918, *Providence & Worcester Co.* v. *Smith,* 396 U. S. 1062. In these cases, companions to the main litigation, the Providence & Worcester Company sought plenary review of the District Courts' orders insofar as they had sustained the Commission (1) in requiring Penn Central to operate its trains over the Providence & Worcester tracks as a leased line under the conditions of a former long-term lease to New

## II

We first consider the dual review to which the District Courts in New York and Connecticut subjected the price determinations of the Interstate Commerce Commission. From the outset all the parties in the three-judge court recognized that the pricing questions presented in the litigation there were also destined to come before the reorganization court under § 77 of the Bankruptcy Act.[51] Confronted with the prospect of duplicate litigation, the New Haven bondholders asked the three-judge court to enjoin the Commission's certification of its plan of

Haven, subject to Penn Central's right to commence an abandonment proceeding before the Commission under § 1 (18) of the Interstate Commerce Act, 49 U. S. C. § 1 (18), and subject further to Providence & Worcester's securing a charter revision to eliminate voting restrictions against Penn Central as a principal shareholder; and (2) in limiting the liability of Penn Central with respect to certain claims of Providence & Worcester, both *in rem* and *in personam*, arising against the New Haven prior to the latter's inclusion in Penn Central. See *Manufacturers Hanover Trust Co.* v. *United States,* 300 F. Supp. 185 (opinion of three-judge court).

[51] A similar problem had presented itself in the immediately preceding round of the litigation arising from the merger. There the Commission's order had embraced not only the Penn Central combination and the takeover of New Haven, but the inclusion of the "protected carriers" in the Norfolk & Western system as well. See n. 11, *supra.* Despite the variety of issues and the number of parties, the cases eventually came before a single District Court, and the danger of multiple litigation in six or more different courts was avoided. See *Erie-Lackawanna R. Co.* v. *United States,* 279 F. Supp., at 323–324, aff'd *sub nom. Penn-Central Merger Cases,* 389 U. S., at 497 n. 2, 503, 505 n. 4. Even earlier, when the Commission had first ordered inclusion of all New Haven service as a condition to the Penn Central merger, it had pointed out that "since New Haven is in bankruptcy, its inclusion will entail reorganization problems under section 77 of the Bankruptcy Act which must be resolved in conjunction with any inclusion proceeding herein." *Merger Report,* 327 I. C. C., at 525; see also *id.,* at 527; and see *Second Supplemental Report,* 331 I. C. C., at 652.

reorganization to the District Court in Connecticut. Counsel urged that "if such certification is not restrained, the questions presented by the complaint herein under Section 5 (2) of the Interstate Commerce Act will also be before the Bankruptcy Court under Section 77 of the Bankruptcy Act . . . ." The three-judge court denied the bondholders' application for injunctive relief. In its view, "the balance of convenience tilt[ed] heavily in favor of allowing the Connecticut court to proceed to such extent as it is advised," since the grant of such an injunction could delay the reorganization proceedings for a substantial time.

In this ruling the three-judge court was correct. The jurisdiction of the reorganization court was not open to question. Upon its approval of the New Haven's petition for reorganization in 1961, that court had acquired "exclusive jurisdiction of the debtor and its property wherever located . . . ." Bankruptcy Act, § 77 (a), 11 U. S. C. § 205 (a).[52] Subject to the court's control, the trustees whom it appointed were empowered "to operate the business of the debtor." *Id.,* § 77 (c)(2), 11 U. S. C. § 205 (c)(2). They were thus charged with the dual responsibility of conserving the debtor's estate for the benefit of creditors and preserving an ongoing railroad in the public interest. *Massachusetts* v. *Bartlett,* 384 F. 2d 819, 821, cert. denied, 390 U. S. 1003; 5 Collier on Bankruptcy ¶ 77.02, at 469–470 (14th ed. 1969).[53]

---

[52] *Callaway* v. *Benton,* 336 U. S. 132, 142; *Meyer* v. *Fleming,* 327 U. S. 161, 164; *Thompson* v. *Magnolia Petroleum Co.,* 309 U. S. 478, 483; *Continental Illinois National Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.,* 294 U. S. 648, 662; cf. *Ex parte Baldwin,* 291 U. S. 610, 615; *Isaacs* v. *Hobbs Tie & Timber Co.,* 282 U. S. 734, 737.

[53] Cf. *Continental Illinois National Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.,* 294 U. S., at 676; *Van Schaick* v. *McCarthy,* 116 F. 2d 987, 992.

With these goals in view, the statute bestowed a "broad and general" authority upon both the court and the trustees. Cf. *Palmer* v. *Massachusetts*, 308 U. S. 79, 85. The provisions of § 77 "doubtless suffice[d] to confer upon the [reorganization court] power appropriate for adjusting property rights in the railroad debtor's estate and, as to such rights, beyond that in ordinary bankruptcy proceedings." *Id.*, at 85–86; cf. 5 Collier, *supra*, ¶ 77.11, at 498–499. Together, the court and the Commission "unquestionably" had "full and complete power not only over the debtor and its property, but also, as a corollary, over any rights that [might] be asserted against it." *Callaway* v. *Benton*, 336 U. S. 132, 147.[54] One such power was precisely that which the Commission was about to propose that the reorganization court exercise—the power to confirm a plan of reorganization providing for "the sale of all . . . of the property of the debtor . . . ." Bankruptcy Act, § 77 (b)(5), 11 U. S. C. § 205 (b)(5). To that end the Commission was required to certify its proposal to the court as a prerequisite to judicial approval. § 77 (d), 11 U. S. C. § 205 (d). Injunctive intervention by the three-judge court would thus have disrupted an essential statutory phase of the New Haven reorganization.

The United States also sought to avoid duplicate litigation—but by bypassing the New York rather than the Connecticut federal court. In a motion filed shortly

---

[54] In *Callaway*, this Court stressed the control the reorganization court has over the debtor's property, including any leasehold estate: "Clearly, control of the physical property must remain in the court which has the ultimate responsibility for operating it. And in order to protect the estate of the debtor from dissipation through losses suffered in the operation of the lessor's property, responsibility for the determination of the amount of the losses and provision for their recoupment from the lessor was properly lodged in the court supervising the reorganization of the debtor." 336 U. S., at 144.

after the commencement of the New Haven bondholders' suit in the three-judge court, the Government moved to dismiss the complaints for lack of subject-matter jurisdiction. In support of the motion it was argued that (1) until the Commission certified the terms of inclusion to the reorganization court, Condition 8 under which Penn Central had pledged to take in New Haven was not satisfied and the Commission's order was not yet reviewable; (2) by virtue of the § 77 aspects of the case, the reorganization court had exclusive jurisdiction over the pricing questions sought to be presented to the three-judge court; and (3) even on the assumption that the three-judge court had jurisdiction, it should stay its hand as a matter of equity to avoid an unnecessary interference with the proceedings before the reorganization court.

The Government's motion to dismiss was opposed by Penn Central, the New Haven trustees, the State of New York, and the bondholders. Significantly, the Commission did not oppose the motion. Indeed, the Commission agreed with the United States that "most (and perhaps all) of the issues raised by the plaintiffs in this three-judge Court will be reviewable by the Reorganization Court," conceded that "the resulting concurrent jurisdiction is awkward, at least in theory," and concluded tentatively that "the scope of judicial review . . . in the Reorganization Court would, as a practical matter[,] be the same as in this three-judge Court." The three-judge court denied the Government's motion to dismiss. The bondholders' actions, the court said, came within the letter of the statutes authorizing review of orders of the Commission. The court conceded there was "an area of overlap" between the work of the New York and Connecticut forums, but thought nothing in § 77 or decisional law superseded that dual arrangement. See 289 F. Supp., at 424 n. 3.

The three-judge court correctly observed that in ordering New Haven's inclusion in Penn Central the Commission had properly exercised its authority under both § 5 of the Interstate Commerce Act and § 77 of the Bankruptcy Act. The fact that the New Haven was in reorganization under the Bankruptcy Act did not preclude the Commission from exercising its statutory power, in passing on the merger application of two railroads, to require the inclusion of a third. Interstate Commerce Act, § 5 (2)(d), 49 U. S. C. § 5 (2)(d).[55] "The Commission can undoubtedly carry on § 5 proceedings simultaneously with § 77 reorganization proceedings . . . ." *Callaway* v. *Benton,* 336 U. S., at 140. Here the transfer of the New Haven assets was as much a part of a merger under § 5 as it was a plan of reorganization under § 77.

Moreover, at the outset of the litigation, the jurisdiction of neither the New York nor the Connecticut court was "complete." On the one hand, the reorganization court lacked coercive power over Penn Central: under § 77 it could neither approve nor disapprove the merger *qua* merger, and it could not compel Penn Central to purchase the New Haven assets. So far as § 77 was concerned, Penn Central stood in the position of a potential purchaser, willing but not obliged to buy the New Haven properties. Cf. *Callaway* v. *Benton,* 336 U. S., at 137; *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523,

---

[55] Section 5 (2) (d) provides: "The Commission shall have authority in the case of a proposed [merger] transaction under this paragraph involving a railroad or railroads, as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads requesting such inclusion, and upon a finding that such inclusion is consistent with the public interest."

550; *Old Colony Bondholders* v. *New York, N. H. &
H. R. Co.,* 161 F. 2d 413, 434 n. 5 (Frank, J., dissenting),
cert. denied *sub nom. Protective Committee* v. *New York,
N. H. & H. R. Co.,* 331 U. S. 858; *In re New York, N. H.
& H. R. Co.,* 54 F. Supp. 595, 619. On the other hand,
the three-judge court could not by itself effect a con-
veyance of the New Haven properties to Penn Central,
nor could it compel the debtor's trustees to do so without
the consent of the reorganization court.

Moved largely by the concern that neither court might
have jurisdiction over the entire case, the three-judge
court was of the opinion that matters should proceed
simultaneously in both forums with a view to bringing
the § 5 and § 77 aspects before this Court at the same
time. Given the complexities of the jurisdictional ques-
tion and the importance of an expedited determination
of the merits, the three-judge court produced an under-
standable solution to the problem insofar as it ensured
that the entire case would come before this Court without
the risk that the parties might have spent an extensive
period litigating in the wrong forum.

But the circumstances of the case did not inexorably
command review in two separate courts. There was no
danger that application of the "fair and equitable" test
under § 77 (e)(1) would yield results different from
those to be produced by the "just and reasonable" test
of § 5 (2)(b) for mergers or the "equitable" test for in-
clusions under § 5 (2)(d). See *Callaway* v. *Benton,* 336
U. S., at 140.[56] The reorganization statute mandates

[56] For the text of § 5 (2)(d), see n. 55, *supra.* Section 5 (2)(b)
provides in pertinent part: "If the Commission finds that, subject
to such terms and conditions and such modifications as it shall find
to be just and reasonable, the proposed [merger] transaction is
within the scope of [an earlier subdivision of the statute] . . . and
will be consistent with the public interest, it shall enter an order

that any disposition of the debtor's properties must not be "inconsistent with the provisions and purposes" of the Interstate Commerce Act, Bankruptcy Act, § 77 (f), 11 U. S. C. § 205 (f), and "the requisite findings under the two acts are equivalent." *In re Chicago, R. I. & P. R. Co.,* 168 F. 2d 587, 594, cert. denied *sub nom. Texas* v. *Brown,* 335 U. S. 855. This Court has stressed that § 77 incorporates the elements of § 5, *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.,* 347 U. S. 298, 310, and we have ruled that where the Commission proposes a merger as part of a § 77 plan of reorganization, it must act "in accordance with all the requirements and restrictions applicable to mergers" under the Interstate Commerce Act, *id.,* at 309; cf. *Ecker* v. *Western Pacific R. Co.,* 318 U. S. 448, 481; *New England Coal & Coke Co.* v. *Rutland R. Co.,* 143 F. 2d 179, 186. Here the Commission had demonstrated its awareness of the statutory interrelationship, specifically devising inclusion terms under § 5 to satisfy the requirements of § 77. *Second Supplemental Report,* 331 I. C. C., at 654.

Moreover, there was no reason to suppose that the reorganization court would be unable to adjudicate all the questions presented by the terms of the Commission's inclusion order. Although the three-judge court expressed concern that certain issues, such as a loss-sharing arrangement during the interim period between merger and inclusion, might not lie within the jurisdiction of the reorganization court, the reorganization court nevertheless reached those issues without, so far as the record discloses, jurisdictional objections from any party.

The three-judge court thus confronted a situation where it was asked to consider the same pricing questions, to be determined by recourse to the same standards of

approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . . ."

review, as the reorganization court. "[N]ot only would it . . . involve . . . a duplication of labor to [accept] . . . jurisdiction but it might"—and in fact did—"result . . . in contradictory rulings upon the same issue[s]." *Palmer* v. *Warren,* 108 F. 2d 164, 167, aff'd, 310 U. S. 132. In these circumstances the three-judge court might well have stayed its hand under the traditional principle that "the court first taking over the res, draws to itself power to determine all claims upon it." *Palmer* v. *Warren, supra;* cf. *Oklahoma* v. *Texas,* 258 U. S. 574, 581; *Palmer* v. *Texas,* 212 U. S. 118, 126, 129; *Wabash R. Co.* v. *Adelbert College,* 208 U. S. 38, 54; *Farmers' Loan & Trust Co.* v. *Lake Street Elevated R. Co.,* 177 U. S. 51, 61. We recognize that that principle has commonly applied in cases where both courts assert *in rem* jurisdiction over the property in dispute, and that here the three-judge court's jurisdiction was *in personam* in character. But the conflict was nonetheless one "between two coordinate courts of concurrent, overlapping jurisdiction, neither belonging to a class which by paramount law is categorically given a jurisdiction over the particular subject matter paramount to the jurisdiction of the other." *In re New York, N. H. & H. R. Co.,* 26 F. Supp. 18, 24, aff'd *sub nom. Palmer* v. *Warren, supra.* And given that conflict, the three-judge court could have followed the settled proposition that "[t]he court which first acquired jurisdiction through possession of the property is vested, while it holds possession, with the power to hear and determine all controversies relating thereto." *Lion Bonding & Surety Co.* v. *Karatz,* 262 U. S. 77, 89.

Surely a vesting of primary jurisdiction in the reorganization court comports with the basic purpose of § 77. Congress enacted that statute in part "to prevent the notorious evils and abuses of consent receiverships," *New England Coal & Coke Co.* v. *Rutland R. Co.,* 143

F. 2d, at 184, of which one of the more egregious was the requirement of an ancillary filing and order of appointment in the federal court for every district in which the debtor had property. See 5 Collier, *supra*, ¶ 77.02, at 467. Although, of course, the jurisdiction of the three-judge court was not ancillary to that of the reorganization court in a technical sense, dual review of issues ultimately going only to the valuation of the debtor's estate would resurrect the discredited practice of the equity receivership—it "would tend greatly to foment conflicts between coordinate courts and compel creditors, in the protection of their interests, to ride the circuit, demonstrating the basis of their positions in successive courts." *In re New York, N. H. & H. R. Co.,* 26 F. Supp., at 23.

But we need not decide the question exclusively on the grounds just set out. For in the circumstances in which the United States presented its motion to dismiss in this case, the course of prior litigation had left the three-judge court virtually nothing to decide. On January 15, 1968, this Court had upheld the validity of the Penn Central merger under § 5 of the Interstate Commerce Act, conditioned on the inclusion of New Haven on terms subject to objections to be "registered and adjudicated in the bankruptcy court or upon judicial review as provided by law." *Penn-Central Merger Cases,* 389 U. S., at 511. We had permitted a postponement of the inclusion of New Haven on the basis of Penn Central's acceptance of the inclusion requirement, *id.,* at 509, and because by its act of merger Penn Central would "perforce accept . . . appropriate conditions respecting the New Haven . . . ." *Id.,* at 510.

Two weeks later Penn Central merged. At that point the lack of jurisdictional "completeness" in the reorganization court, to which we have earlier referred, was cured; for there now remained no question of Penn Cen-

tral's obligation to take over the assets of the New Haven. With Penn Central having given its irrevocable consent to the inclusion of New Haven by its act of merger, it was evident that whatever terms the reorganization court might confirm, subject to review on appeal to the Court of Appeals followed by certiorari here, would bind Penn Central by virtue of its merger commitment. Of course, the terms of the inclusion must themselves be "just and reasonable" and "equitable" under § 5. But those terms now involved only the value to be accorded the assets transferred, and resolution of that issue was the essence of the § 77 process. "The heart of . . . a determination [of the validity of a plan of reorganization] is a finding of fact . . . as to the value of the debtor's property." *In re New York, N. H. & H. R. Co.*, 147 F. 2d 40, 49, cert. denied *sub nom. Massachusetts v. New York, N. H. & H. R. Co.*, 325 U. S. 884. See 5 Collier, *supra*, ¶ 77.14, at 538–539; cf. *Consolidated Rock Prods. Co. v. Du Bois*, 312 U. S. 510, 524–525; *First National Bank v. Flershem*, 290 U. S. 504, 527; *Second Supplemental Report*, 331 I. C. C., at 652. In short, with identical issues before the two courts, with those issues involving only questions going to the value of a § 77 debtor's estate, with congruent standards of review, and with the irrevocable promise of Penn Central to take in New Haven, the three-judge court should have stayed its hand in the New Haven bondholders' litigation.[57]

---

[57] Such abstention would in no way have limited Penn Central's full participation in judicial review of the Commission proceedings. Penn Central came before the reorganization court as a "party in interest" under § 77 (e) and did not oppose the order of the court making it a party to the proceeding; the company participated fully in all further hearings in the reorganization court; it took a protective appeal from the judgment of the court remanding the matter to the Commission after the first round of review, and it appealed again from the judgment of the court following the second round of review. At no time has anyone questioned Penn Central's

Prior decisions of other three-judge courts, affirmed by this Court on direct appeal, lend support to the proposition that the three-judge court should have deferred to the reorganization court. In *Chicago & N. W. R. Co.* v. *United States,* 52 F. Supp. 65, the debtor railway company brought suit against the Commission in the United States District Court for the Northern District of Illinois, seeking three-judge-court review of a plan of reorganization previously approved by the Commission and the courts. The District Court noted its "limited power" under the statute providing for review by a court of three judges, 52 F. Supp., at 66. It conceded the "seemingly applicable language" of the three-judge-court statute to "any order of the Interstate Commerce Commission," but held that once the Commission has approved a plan of reorganization under § 77, "appeal from Commission orders in connection with bankruptcy proceedings lies only to a district court (of one judge) sitting in bankruptcy, not to a district court (of three judges) assembled under the Urgent Deficiencies Act." *Id.,* at 67.[58] On direct appeal, this Court summarily affirmed the District Court's judgment. 320 U. S. 718.

Even closer in point is a case that arose during the first reorganization of the New Haven Railroad—*Group of Boston & Providence R. Corp. Stockholders* v. *ICC,* 133 F. Supp. 488. Shareholders of the Boston & Providence, also undergoing reorganization, sought judicial review before a three-judge court of the Commission's refusal to provide joint rates as between New Haven and Boston & Providence—exclusively an Interstate Commerce Act function. See Act, §§ 1 (4), 15 (6), 49

status as a party litigant in the reorganization court or challenged its right to make a full presentation of its case there, on appeal to the Court of Appeals, or on review by writ of certiorari in this Court.

[58] The District Court also relied upon the prior adjudication of the validity of the plan. See 52 F. Supp., at 66 n. 1, 67.

U. S. C. §§ 1 (4), 15 (6). The court held that to grant the shareholders the ruling they sought would contravene the revenue-allocation formula already adopted by the New Haven's reorganization court and affirmed by the Court of Appeals and the Supreme Court. The three-judge court accepted the view of the Commission that "so long as the Boston & Providence lines are operated by the New Haven as lessee for the account of the lessor . . . , the Connecticut district court . . . has exclusive jurisdiction to pass on the accounting for such operation." 133 F. Supp., at 493. Again, this Court summarily affirmed. *Boston & Providence R. Corp. Stockholders* v. *New York, N. H. & H. R. Co.,* 350 U. S. 926.

We therefore hold that the three-judge court here should have granted the Government's motion to the extent of deferring to the reorganization court in proceedings ultimately involving only the price to be paid for the assets of the debtor's estate.[59]

---

[59] It is noteworthy that when the Commission drafted the provision under which Penn Central was obligated to take in New Haven, it evidently contemplated that review would take place only in the reorganization court. Condition 8 of the Merger Report, the text of which is set out in the text above at 409, required Penn Central to take in New Haven with terms of inclusion to be "fair and equitable"—language peculiar to the Bankruptcy Act, and instinct with legal significance peculiar to that statute. See *Case* v. *Los Angeles Lumber Prods. Co.,* 308 U. S. 106, 115–119; Bankruptcy Act, § 77 (e) (1), 11 U. S. C. § 205 (e) (1). Condition 8 subjected the agreement negotiated by the parties to "the approval of the Bankruptcy Court and the Commission." And it also provided, in the event the parties were unable to agree to the elements of inclusion, for the imposition of "such fair and equitable terms and conditions as the Commission may impose, . . . subject to approval by the Bankruptcy Court . . . ." Repeated references to terms of art in bankruptcy law and to the bankruptcy court cannot be thought to lack meaning. Still less can we assume that the studied omission of any mention of the three-judge court was without significance.

## III

In turning to the judgment of the reorganization court, we first review the standards under which that court passed upon the Commission's rulings.

After 35 years of § 77, as amended, it is unnecessary to recanvass the two basic objectives of the statute—the conservation of the debtor's assets for the benefit of creditors and the preservation of an ongoing railroad in the public interest. See generally 5 Collier, *supra,* ¶ 77.02, at 469–470. Central to the statutory objective that the reorganized company should, if at all possible, emerge as a "living, not a dying . . . enterprise," *Van Schaick* v. *McCarthy,* 116 F. 2d 987, 993, is the understanding that "a railroad [is] not like an ordinary insolvent estate." *Palmer* v. *Massachusetts,* 308 U. S., at 86. (Footnote omitted.) To the traditional equity jurisdiction of the bankruptcy court, § 77 adds the oversight of the Interstate Commerce Commission, the agency "specially charged with the public interest represented by the transportation system." *Ibid.* The statute contemplates that "[t]he judicial functions of the bankruptcy court and the administrative functions of the Commission [will] work cooperatively in reorganizations." *Warren* v. *Palmer,* 310 U. S. 132, 138. (Footnote omitted.)

In structuring the cooperative endeavor of agency and court, Congress "placed in the hands of the Commission the primary responsibility for the development of a suitable plan" for the debtor railroad. *Ecker* v. *Western Pacific R. Co.,* 318 U. S., at 468. As the Court said in *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co., supra,* "The ratio of debt to stock, the amount of fixed as distinguished from contingent interest, the kind of capital structure which a particular company needs to survive the vicissitudes of the business cycle—all these have been reserved by Congress for the expert

judgment and opinion of the Commission, which the courts must respect." 318 U. S., at 545. See also *In re New York, N. H. & H. R. Co.,* 54 F. Supp. 595, 604. In the development of the plan of reorganization, § 77 also has accorded the Commission primary responsibility for determining wherein lies the "public interest," which does not refer generally to matters of public concern apart from the public interest in the maintenance of an adequate rail transportation system, cf. *United States* v. *Lowden,* 308 U. S. 225, 230, but includes "in a more restricted sense," *ibid.,* concern for "the amount and character of the capitalization of the reorganized corporation," *Ecker* v. *Western Pacific R. Co.,* 318 U. S., at 473–474; cf. *Massachusetts* v. *Bartlett,* 384 F. 2d, at 821, as well as the "adequacy of transportation service, . . . its essential conditions of economy and efficiency, and . . . appropriate provision and best use of transportation facilities." *Texas* v. *United States,* 292 U. S. 522, 531; *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 25. As is clear from the legislative history and § 77 itself, the deference to the Commission as initiator of the plan of reorganization stems from the "recognition by everyone of the advantages of utilizing the facilities of the Commission for investigation into the many-sided problems of transportation service, finance and public interest involved in even minor railroad reorganizations and utilizing the Commission's experience in these fields for the appraisals of values and the development of a plan of reorganization, fair to the public, creditors and stockholders." *Ecker* v. *Western Pacific R. Co.,* 318 U. S., at 468. (Footnote omitted.)

But the respect given the Commission as draftsman of the plan of reorganization entails no abdication of judicial responsibility for the workings of the administrative agency. As we have had occasion to say in describing other aspects of the Commission's work, " 'Congress did not purport to transfer its legislative power to

the unbounded discretion of the regulatory body.' " *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 167. Far from displacing the judicial function, § 77 strikes a "balance between the power of the Commission and that of the court." *Ecker* v. *Western Pacific R. Co., supra,* at 468. The chancellor remains "a necessary and important factor in railroad reorganization"; the statutory objective is "attained only through properly coordinated action between the Commission and the court." *Id.,* at 474–475. (Footnote omitted.) It remains for the reorganization court to ascertain that the Commission "has given consideration to each element of value concerned in its over-all appraisal, and has not wrongly decided legal questions involved in the problems of valuation and of allotment of equivalent securities . . . ." *Old Colony Bondholders* v. *New York, N. H. & H. R. Co.,* 161 F. 2d, at 420.

But the reorganization court may also do more. Under § 77 (c)(13), 11 U. S. C. § 205 (c)(13), the court on its own motion may refer matters to a special master for the hearing of such evidence as the court may desire— a provision which permits the "building up of a group of men [entirely apart from the Commission] thoroughly informed in railroad reorganization matters." H. R. Rep. No. 1897, 72d Cong., 2d Sess., 6 (1933). And under § 77 (e), 11 U. S. C. § 205 (e), the court may itself hold hearings upon the Commission's certification of its plan of reorganization, at which the court is empowered to take evidence beyond that received by the Commission— a supplementary power, unknown to conventional judicial review, but deemed essential to the reorganization court's exercise of its extraordinary "cram down" powers.[60] See S. Rep. No. 1336, 74th Cong., 1st Sess., 3

---

[60] Pursuant to § 77 (e), 11 U. S. C. § 205 (e), "the judge shall confirm the plan [of reorganization] if satisfied that it has been accepted by or on behalf of creditors of each class to which submission is required . . . holding more than two-thirds in amount of

(1935); H. R. Rep. No. 1283, 74th Cong., 1st Sess., 3 (1935). The statutory authority to appoint special masters and to hold evidentiary hearings reflects the unique powers possessed by the reorganization court in passing upon the Commission's proposed plan of reorganization.

In sum, Congress has confided to the reorganization court the "power to review the plan to determine whether the Commission has followed the statutory mandates . . . and whether the Commission had material evidence to support its conclusions." *Reconstruction Finance Corp. v. Denver & R. G. W. R. Co.*, 328 U. S. 495, 509; cf. *Penn-Central Merger Cases*, 389 U. S., at 498–499. In the reorganization court reposes ultimate responsibility for determining that the plan presented to it by the Commission satisfies the "fair and equitable" requirement of § 77. See *In re New York, N. H. & H. R. Co.*, 16 F. Supp. 504, 507. And at the heart of that determination, as we have already noted, is the valuation of the debtor's property. Here, as elsewhere in the reorganization proceedings, the court must look to the conclusion recommended by the Commission. See *Ecker v. Western Pacific R. Co.*, 318 U. S., at 472–473; cf. *Freeman v. Mulcahy*, 250 F. 2d 463, 472–473, cert. denied *sub nom. Boston & Providence R. Co. v. New York*,

---

the total of the allowed claims of such class which have been reported in said submission as voting on said plan, and by or on behalf of stockholders of each class to which submission is required . . . holding more than two-thirds of the stock of such class which has been reported in said submission as voting on said plan; and that such acceptances have not been made or procured by any means forbidden by law: *Provided,* That, if the plan has not been so accepted by the creditors and stockholders, the judge may nevertheless confirm the plan if he is satisfied and finds, after hearing, that it makes adequate provision for fair and equitable treatment for the interests or claims of those rejecting it; that such rejection is not reasonably justified in the light of the respective rights and interests of those rejecting it and all the relevant facts; and that the plan conforms to the [statutory] requirements . . . ."

*N. H. & H. R. Co.*, 356 U. S. 939; *In re New York, N. H. & H. R. Co.*, 54 F. Supp. 595, 600. And often the Commission's conclusion will entail less a statement of mathematical certainty than an estimate of what the market will say when it speaks to the subject. "But that estimate must be based on an informed judgment which embraces all . . . relevant . . . facts . . . ." *Consolidated Rock Prods. Co.* v. *Du Bois,* 312 U. S., at 526. "The judicial function is to see to it that the Commission's 'estimate' is not a mere 'guess' but rests upon an informed judgment based upon an appraisal of all . . . relevant . . . facts . . . , and is not at variance with the statutory command." *Freeman* v. *Mulcahy,* 250 F. 2d, at 473. In performing that function, the court must proceed with awareness that its review of the Commission's conclusion on valuation, as with every other important determination that the court is to make, calls for an " 'informed, independent judgment' " of its own. *Consolidated Rock Prods. Co.* v. *Du Bois,* 312 U. S., at 520; *National Surety Co.* v. *Coriell,* 289 U. S. 426, 436.

There remains to consider the scope of review in this Court in passing upon the judicial determinations of the reorganization court. That we have granted certiorari to the Court of Appeals in advance of the appellate court's judgment does not alter the fact that "our task is limited." *Penn-Central Merger Cases,* 389 U. S., at 498. It is not for us to pass upon the myriad factual and legal issues as though we were trying the cases *de novo.* "It is not enough to reverse the District Court that we might have appraised the facts somewhat differently. If there is warrant for the action of the District Court, our task on review is at an end." *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S., at 564.

## IV

As we have earlier noted, the purchase and sale negotiated by Pennsylvania, New York Central, and the New

Haven trustees rested upon the estimated liquidation value of the New Haven properties to be transferred, rather than the earning power of the New Haven as an operating entity. *Second Supplemental Report,* 331 I. C. C., at 657. The parties to the Purchase Agreement thus gave recognition to the reality of New Haven's desperate financial situation, as well as to the power of the reorganization court to order the sale of the debtor's properties at not less than the "fair upset" price under § 77 (b)(5) of the Bankruptcy Act. In approving the negotiators' approach to the price question, the Commission observed that asset value rather than earning power was the primary determinant because New Haven had "long been dry of earning power." 331 I. C. C., at 657. "If there is one thing on this record that is clear and undeniable," the Commission concluded, "it is that N[ew] H[aven] has neither earning power nor the prospect of earning power." *Id.,* at 687.

In light of "the chronic deficit character" of the New Haven operation, *id.,* at 658, the reorganization court understandably accepted the liquidation approach to valuation. "The concept of 'going concern value' is fictional as applied to the New Haven," it said, "because it ignores the Railroad's long and continuing history of deficit operations." 289 F. Supp., at 455. (Footnote omitted.)

Before the Commission, the New Haven trustees and Penn Central submitted complete studies of the debtor's liquidation value, consisting of current assets, special funds, investments, real estate, and other assets. As the Commission described it, "Liquidation value as used by both the N[ew] H[aven] trustees and Penn-Central [was] the estimated market value that would be realized in a total liquidation, less the cost of dismantling properties and other liquidation costs and after discounting proceeds to present worth." 331 I. C. C., at 697; cf.

*In re New York, N. H. & H. R. Co.,* 304 F. Supp., at 797–798.

The New Haven study, based on the assets held by the debtor as of December 31, 1965, was made over a nine-month period by persons who, the Commission found, were familiar with the railroad, its operating area, and the nature and condition of its properties. The Penn Central study valued the assets as of December 31, 1966; it was made in under two months by persons less familiar with the railroad. Both studies revealed that nearly half the New Haven's asset value consisted of its holdings in real estate. The New Haven study produced a gross value for all assets, exclusive of New Haven's interest in the Grand Central Terminal properties, of $230,290,000; the Penn Central study, $150,321,000.

Consistent with the liquidation hypothesis, both New Haven and Penn Central deducted from the gross value of the New Haven assets the expenses that would be incurred if a liquidation in fact took place. These included not only the estimated expenses of sale but, in the case of bridges, trestles, and culverts, removal costs for conversion of the realty to nonrailroad use—costs that often left the assets with a net negative value. The New Haven trustees hypothesized both a six- and a 10-year liquidation period, with expenses for liquidation operations plus taxes and interest aggregating $59,481,000 and $76,847,000, respectively; Penn Central estimated the expenses of a 10-year sale to be $62,172,000. The net liquidation value of the assets was arrived at by deducting the liquidation expenses and certain current assets not to be transferred to Penn Central, along with a further discount to present worth to reflect the hypothesis that receipts would be coming in over a six- or 10-year period.

The Commission concluded that once the New Haven estate embarked on a liquidation sale, it would dispose of the assets as quickly as practicable; the Commission

accordingly found that "the bulk of the liquidation could be completed within a period of 6 years." 331 I. C. C., at 663. The Commission also concluded that the 6% discount rate employed by New Haven and challenged as too low by Penn Central was offset by the conservative valuation of the assets themselves. *Id.*, at 664. The Commission's ultimate finding was that the liquidation value of the New Haven assets to be conveyed to Penn Central "is about $125 million as of December 31, 1966." *Id.*, at 688.

As we have noted earlier, the reorganization court did not accept the $125,000,000 figure, with a consequent remand and second round of review. The bulk of the Commission's valuation has now won the approval of the reorganization court and is not challenged by any of the parties here. There remains in dispute, however, the valuation of several items, aggregating nearly $200,000,000, and it is to those items that we now turn.

1. *The Grand Central Terminal properties.* By far the largest component in the dispute over the liquidation value of the New Haven is the debtor's interest in the Grand Central Terminal properties. This real estate complex consists of several parcels in the area of midtown Manhattan bounded by 42d Street on the south, Madison Avenue on the west, 60th Street on the north, and Lexington Avenue on the east. Included in the properties are the Barclay, Biltmore, Commodore, Roosevelt, and Waldorf-Astoria hotels; the Pan American building as well as other office buildings along Park Avenue; and the Yale Club. The total assessed value of the Grand Central Terminal properties as of 1965 was $227,225,000.

The New Haven railroad acquired the right to run its trains into Manhattan in 1848, when it entered into an agreement for use of the tracks of the predecessor of the New York Central, to extend for the lives of the respec-

tive charters of the two companies. In 1848 New Haven also acquired an easement over the tracks by legislation of the State of New York. See *New York, N. H. & H. R. Co.* v. *ICC*, 55 F. 2d 1028, 1030. The 1848 agreement underlay various subsequent contracts in the 1870's, '80's, and '90's between the New York Central and the New Haven.

In 1903 and 1904 the State of New York enacted further legislation requiring the placement of the railroad tracks below ground through the 15-block stretch north of the present Terminal. It did not take the Central entrepreneurs long to realize that compliance with the legislative edict left the company a vast area of midtown Manhattan suitable for realty development. In 1907 Central entered into the basic contract with New Haven under which the present Grand Central Terminal was built. The 1907 instrument recited that it had become necessary to rebuild the Terminal, including yards and tracks, in order to provide facilities for the proper management and conduct of the two railroads. Central promised to buy needed land and rights-of-way; New Haven, to make payments in connection with the demolition of the old station and the construction of the new. The 1907 agreement further recited that nothing it contained should impair the rights of the parties under the 1848 agreement. It then went on to provide that Central "doth demise, let and lease" the use of the railroad terminal to New Haven in common with Central. "Railroad terminal" was defined to "mean and include the land, and interests in land, and all improvements thereon . . . , and all rights in any ways on which said land may abut . . . ."

Paragraph 4 of the 1907 agreement provided for joint contributions by New Haven and Central to Terminal maintenance and operation, calculated on the parties' respective car and locomotive usage of the station. The paragraph also obligated New Haven to a minimum

annual payment of $160,179.92 without regard to the percentage of its use of the Terminal. In addition, ¶ 14 of the agreement stipulated that the manager of the enterprise should credit all rentals and other compensation received from the railroad terminal to "the fixed charges or to the cost of maintenance and operation of the said Railroad Terminal, as the same may be applicable."

In 1909, Central and New Haven began the joint financing of construction on the property referred to in the 1907 agreement, and in 1913, they entered into a supplemental agreement in order "to express more fully the intent of the parties hereto as to the right of the New Haven Company and the Central Company with respect to the construction, maintenance and use" of the Terminal properties. The supplemental agreement recited that New Haven's right of user included "the right . . . to join with . . . Central . . . in the construction, holding, maintenance and leasing of buildings . . . upon the land included within the Railroad Terminal." The heart of the 1913 amendment was a detailed provision for the sharing and reimbursement of construction and maintenance costs, along with a reaffirmation of the procedure established in ¶ 14 of the 1907 agreement, under which all rentals were to be credited to the Terminal enterprise. In the following years the two parties entered into hundreds of subagreements relating to the leasing, financing, and sharing of rentals from buildings constructed in the Terminal area. Income from the buildings was credited to the fixed charges, and to the maintenance and operation of the Terminal itself.

None of the agreements between Central and New Haven expressly provided for the disposition of "excess income" left over after the satisfaction of the Terminal expenses. For half a century after the 1913 agreement, the "excess income" question was of academic interest only, since expenses annually exceeded revenues. But

in 1964, and in each succeeding year, the accounts showed excess income. New Haven demanded part of it, and Central refused. The trustees then brought a contract action in the New York Supreme Court to protect New Haven's interest in the income.

When the New Haven trustees first began negotiations with Pennsylvania and Central for the inclusion of the debtor's assets in Penn Central, they proposed that New Haven's interest in the nonoperating Terminal properties be excluded from the takeover, with final disposition deferred until the outcome of the then-pending litigation. But Central insisted it would not consider inclusion of New Haven in the merger unless it got absolute title to all the Terminal properties. The New Haven trustees thereupon sought the advice of legal counsel. They were told that under the agreements with Central, New Haven not only had no fee or leasehold interest in the properties, but had no rights at all that would survive cessation of its train service in and out of the Terminal other than the reimbursement of monies already advanced toward construction of buildings in the area. Although the New York lawsuit was pending to determine New Haven's right to participate in the excess income, the trustees concluded that as an alternative to risking "tremendous expense and long delay" in litigation, 289 F. Supp., at 462, resolution of the inclusion negotiations was of sufficient value to warrant their transferring the debtor's interest, whatever it might be, to Penn Central for no consideration whatever in exchange.

From the outset the bondholders dissociated themselves from the trustees on the question of the debtor's rights in the Terminal properties. Some of the New Haven creditors claimed the value of those rights to be $20,000,000—the sum of unreimbursed advances for building construction and capital improvements as carried on the New Haven books. Others said it was $50,000,000—the capitalization of one-half the excess in-

come at 5%. Still others argued for one-half the value of the fee itself—nearly $115,000,000.

In its Second Supplemental Report the Commission eschewed responsibility for determining the legal rights of New Haven in the properties and set out only to value the debtor's claim. Confronting the complex legal relationship between Central and New Haven, with the consequent unpredictability of litigation, and unwilling to defer valuation of New Haven's interest to the completion of all possible contract actions between the two parties, the Commission set the value of the claim at $13,000,000. It arrived at this figure by taking the average of two unrelated sums: $5,000,000, representing Penn Central's estimate of the nuisance value of New Haven's claim; and $20,000,000, representing the capitalization of New Haven's share of the average of the excess income in 1964 and 1965, based upon its proportional usage of the Terminal.

Faced with the Commission's disclaimer of responsibility for resolution of the legal controversy between Central and New Haven, and given the Commission's Draconian solution to the question of value, the reorganization court appointed a special master to consider New Haven's legal interest in the Terminal properties.[61] Based on his

---

[61] Without pausing to assess the propriety of the method by which the Commission originally assessed the value of New Haven's interest in the Terminal properties, we think the reorganization court was correct in undertaking its own resolution of the contractual question. The validity of New Haven's claim "present[ed] a legal question which must necessarily be taken into account" in determining value. *Old Colony Bondholders* v. *New York, N. H. & H. R. Co.,* 161 F. 2d 413, 422, cert. denied *sub nom. Protective Committee* v. *New York, N. H. & H. R. Co.,* 331 U. S. 858. The legal question was one "to which the Commission's specialized skill and experience do not extend." 161 F. 2d, at 429 (L. Hand, J., concurring). The authority of the court to take further evidence is unquestioned. Bankruptcy Act, §§ 77 (c) (13), 77 (e), 11 U. S. C. §§ 205 (c) (13), 205 (e).

study of the complex contractual relations between the two parties, of which we have touched above only on the salient features, the Special Master concluded that Central and New Haven had entered into a "joint venture or partnership . . . of some kind." The Special Master dismissed as untenable both Central's argument that by virtue of its sole ownership of the fee it would acquire full right, title, and interest in the Terminal properties upon the cessation of New Haven's train service, and the bondholders' argument that as a partner the debtor had an undivided one-half interest in the fee. In 1907, when the parties entered into the basic agreement, Central had had title to the realty, and New Haven had had a perpetual right to the use of the tracks by force of state legislation. New Haven thus had "not come to the bargaining table in 1907 in the posture of a supplicant." The two railroads together had joined in the design and construction of a Terminal complex greater than either needed for its own requirements; they had undertaken a "major real estate development to extend over a period of many years"; and to those ends they had provided for a sharing of the Terminal expenses on the basis of their respective car usage, along with a committal of Terminal revenues to the operation of the project. As the Special Master put it, "There can be no question that by mutual agreement these revenues from all of the Grand Central Terminal properties were pooled to apply on the fixed charges and maintenance and operational costs of the Terminal."

In light of the conclusion that Central and New Haven had embarked on an enterprise akin to a partnership, the Special Master concluded that once the Terminal revenues satisfied expenses, the excess income belonged equally to each of the railroads. In his view, the car-use formula of the 1907 agreement ceased to be effective once revenue met expenses, and the principle of equality be-

tween partners took its place. The Special Master noted that the parties had not expressly dealt with the question whether New Haven's interest in the properties would end if New Haven ceased to use the Terminal. But he concluded that in such an event New Haven would still be entitled to half of the excess income; that right "would not and could not be terminated by the mere discontinuance of [New Haven] passenger service into and out of the Terminal." [62]

[62] In 1912 Central and New Haven had erected the Hotel Biltmore through a subsidiary, each railroad supplying half the funds, which were finally reimbursed in 1957. In 1958 Central sought to lease the Biltmore to a controlled subsidiary over New Haven's objection. When New Haven refused to sign the lease, Central claimed that New Haven had broken its agreement and thereby had forfeited all interest in that portion of the enterprise. Central brought suit in New York state court to secure a determination of the parties' respective interests in the property. See *New York Central R. Co.* v. *New York, N. H. & H. R. Co.*, 24 Misc. 2d 414, 208 N. Y. S. 2d 605, aff'd as modified, 13 App. Div. 2d 309, 216 N. Y. S. 2d 928, aff'd *per curiam*, 11 N. Y. 2d 1077, 184 N. E. 2d 194. The conclusions of the New York courts paralleled those of the Special Master. The Supreme Court ruled that New Haven's right to share in rentals after credits to Terminal expenses survived reimbursement of its investment, 24 Misc. 2d, at 428, 208 N. Y. S. 2d, at 618. The Appellate Division agreed, holding that the parties had, "in effect, converted themselves into owners of the fee together" and that "the development of the lands over the tracks was but another step in the joint exploitation of the railroad properties made possible by the covering of the tracks . . . in which [properties] each party had a joint interest . . . ." 13 App. Div. 2d, at 318, 216 N. Y. S. 2d, at 936. The latter court rejected the notion that after paying large sums of money for the construction of buildings and assuming the risk of loss operations in the Terminal enterprise, New Haven should have acquired no right "except the right to join docilely in each of the decisions made by Central." *Id.*, at 319, 216 N. Y. S. 2d, at 937. Although Central retained sole ownership in the fee, that fee was encumbered by the rights of New Haven. The Appellate Division concluded that New Haven's position *vis-à-vis* Central could be described as that of a partner. *Id.*, at 320, 216 N. Y. S. 2d, at 937.

On the first round of review the reorganization court accepted the Special Master's report and incorporated it by reference in its own opinion. The court therefore remanded the matter to the Commission with instructions to value New Haven's one-half interest in the Terminal's future excess income. In addition, the court requested the Commission to "consider and make findings as to what value, if any, attaches to New Haven's present right to share in the income for the purpose of defraying its cost of operating in and out of the terminal." 289 F. Supp., at 463.

In its Fourth Supplemental Report the Commission accepted the determination of the reorganization court that New Haven would have retained a right to one-half the excess income even upon liquidation. 334 I. C. C., at 30–31. Following an extensive consideration of future Terminal expenses and office-building and hotel income, the Commission projected a future excess income of $4,550,000 a year, of which New Haven's 50% share, capitalized at 8%, amounted to $28,438,000. 334 I. C. C. at 39. The new figure thus came to more than twice that awarded by the Commission on the first round.

The Commission also complied with the request of the reorganization court that it consider the value of New Haven's right of access into the Terminal. The Commission concluded that the right would have no value to New Haven unless a buyer were willing to pay for it; that the only potential buyer in sight was the State of New York, which would not need to bid for use of the Terminal; and, accordingly, that New Haven's right of user was valueless. 334 I. C. C., at 32. The bondholders' claim of value for the right of access, the Commission said, amounted to a demand for one-half of all of the income free of the Terminal expenses. Id., at 32 n. 11. On the second round of review, the reorganization court agreed that the Commission's determinations must stand with respect to both the liquidation

value of New Haven's interest in the Terminal proper-
ties and its right of free access into the station.[63]

Many aspects of the controversy over the Grand Cen-
tral Terminal properties have now dropped from con-
tention.[64]   The bondholders no longer claim that New
Haven is entitled to one-half the value of the fee.   Penn
Central no longer claims that its fee ownership of the
properties reduced New Haven's status to that of a mere
grantee retaining only the privilege of entry into the
Terminal.   All parties accept New Haven's right to the
capitalized value of one-half the excess income.[65]   What

[63] "The Special Master , . . concluded there was no value in
the interest, principally because it is not the kind of interest
that would survive liquidation; nor, if it did, could it be assigned.
Moreover, there was no evidence that the expenses of main-
taining the terminal would be any less.   And the idea that the
State of New York, or an interstate authority might pay, directly
or indirectly, some consideration for availing itself of that use is
highly speculative in view of the bargaining positions of the states
and the disposition of the I. C. C. to require Penn Central to furnish
such access free of charge to a state or public authority which
assumed the commuter service, as a condition of Penn Central's
getting rid of that much of the losing and burdensome passenger
service.   While mitigation of a burden may in some circumstances
furnish a consideration, it is not a measurable one for the purpose
of this issue in the case."   304 F. Supp., at 806.

[64] At one stage the litigation over the value of New Haven's
interest in the Terminal properties also involved disputes over which
of four different sets of account books the Commission should use,
the base period from which the Commission might extrapolate
future income and expenses, the rate at which the projected income
flow should be capitalized, and the probable income flow from a
new office building to be constructed on the site of the railroad
station.

[65] The Bondholders Committee presses its challenge that the Com-
mission has understated New Haven's share of excess income by
$700,000 a year, with a capitalized loss of $8,750,000 in value.   The
challenge is predicated on the claim that the Commission improperly
concluded that future hotel profits would not increase but would
remain constant.   334 I. C. C., at 38.   The reorganization court
upheld the Commission in this regard, 304 F. Supp., at 806.   We do

remains is the claim of the bondholders that New Haven is entitled to the capitalized value of its share not only of the excess income remaining after satisfaction of the Terminal expenses, but of the basic income meeting the expenses themselves. Yet the central finding of the reorganization court remains unrefuted: that by force of the agreements between New York Central and New Haven, the Terminal income was first to be devoted to meeting Terminal expenses; only then was the residue to become available for distribution to the two railroads. To be sure, the parties customarily referred to their respective shares of the Terminal revenues. But the Special Master found that the Terminal revenues were allocated to Central and New Haven on their respective car-use bases as an accounting convenience. The car-use formula established by the 1907 agreement "resulted, for accounting purposes, in the corresponding proportion of the revenue entering the Terminal Account being treated as the property of each railroad, and in each

not overturn its judgment on a matter such as this, calling for an informed prediction of future income, expenses, and the rate of return on invested capital in a specific business activity uniquely located in midtown Manhattan.

In addition, it is suggested that upon a cessation of New Haven Terminal operations the costs of maintaining the station would decrease, with a consequent augmentation in the excess income. Of course the station revenues would decrease as well—perhaps as much as or more than the expenses. In the absence of any record evidence on the point, we cannot assume that liquidation would thus have benefited New Haven.

On the second round of review the reorganization court ordered Penn Central to pay New Haven the latter's share of accrued excess income for 1967 and 1968, as a separate sum apart from the purchase price. 304 F. Supp., at 806–807. The Bondholders Committee now asks us to award interest with respect to this payment. The reorganization court rejected the claim, doubtless because the uncertainty of New Haven's legal interest in the excess income precluded a finding that the amount represented a liquidated obligation owed by New York Central. We agree with the court's ruling.

railroad's being relieved *pro tanto* from the amount of its liability to meet the charges . . . ."

The bondholders argue that the basic income of the Terminal could somehow be "freed up" from the obligation to meet Terminal expenses. But the Special Master considered and rejected that theory.

> "Both parties . . . committed themselves to pouring these revenues from the entire Grand Central complex into the Terminal Account under paragraph 14 of the Agreement of 1907. The revenues were to enter that account and were to be expended, superior to the individual interests of each railroad, by being applied on payment of the fixed charges and expenses of operation and maintenance of the Terminal. Those revenues were pledged to that purpose regardless of whether New Haven utilized one per cent or fifty per cent of the Terminal's passenger facilities, or whether it used any of those facilities at all. It was not contemplated that if either railroad discontinued passenger trains into Grand Central the other would be saddled with the entire expense of a terminal larger than either railroad needed without being credited with these entire revenues from the Grand Central Terminal properties to the extent that they were required to meet expenditures . . . ."

Nevertheless, Chase Manhattan argues that the commitment of revenues is merely a creature of the agreement between Central and New Haven as construed by the Special Master, and that the transfer of New Haven's Terminal interests on December 31, 1968 "wiped out" that agreement. "The agreement thereafter was no longer in existence," says Chase, "and Penn Central now has this [basic] income (both the former New York Central's share and the former New Haven's share) free and clear of any restriction against its use in any way

Penn Central sees fit." Stated in this fashion, the argument is self-defeating: since New Haven's right to the basic income derives solely from its agreement with Central, a "wiping out" of that agreement necessarily leaves New Haven without the right as well as without the obligation. But, more importantly, it simply is not true that Penn Central now has New Haven's former share in such income without "any restriction of any kind . . . ." Penn Central also has New Haven's loss operations into and out of the Terminal, and it must meet the expenses occasioned by those operations from some source. Since by definition New Haven's share of the basic income was, as an accounting matter, equal to its share of the Terminal expenses, by its 1968 transfer it has merely surrendered an amount equal to its gain: it has given up its share of the income pledged to the costs of operations at the Terminal, but it has relieved itself of the obligation to meet those costs. By the same token, Penn Central has gained New Haven's share of income, but with the matching loss of New Haven's expenses.

The bondholders' argument must be that entirely apart from the contractual arrangements with Central, New Haven had a valuable right of free access into the Terminal, which Penn Central has now taken over with no compensating payment in exchange. This argument, too, is without merit. It is a misnomer to describe New Haven's right of access to the Terminal as "free." New Haven had a right of entry, rather than a privilege, in the sense that it had access, independently of the consent of the fee owner of the tracks, by force of legislative edict. But the right bestowed by the legislature was conditioned "upon such terms . . . as [have] been or may hereafter be agreed upon by and between" New Haven and Central's predecessor. N. Y. Sess. Laws of 1848, c. 143, § 6. Thus the New Haven right of access has never been free from the obligations imposed by the agreements with Central.

But even if the access right were "free" in the sense that it could survive elimination of New Haven's agreements with Central, we agree with the reorganization court that the Commission correctly concluded it would have no value. And that is the case whether the right is deemed transferred to Penn Central, as in fact it was, on the date of inclusion, or whether, consistent with the liquidation hypothesis on which the parties valued New Haven's other assets, it is deemed to have been offered for sale to a third party upon New Haven's cessation of operations. In the former event, the analysis pertinent to New Haven's contract rights applies with equal force. Penn Central has in fact succeeded to New Haven's right of access, but it has also succeeded to New Haven's deficit operations. Conversely, New Haven has given up a right of entry in exchange for relief from the obligation to provide train service at the station. Indeed, to the extent that the expenses generated by New Haven's use of the Terminal exceeded the revenues attributable to that activity, Penn Central has lost and New Haven gained on the exchange.[66]

The same result is reached if New Haven is deemed to have gone into liquidation. For the bondholders have never shown that anyone would pay a penny for the right to carry on New Haven's deficit-ridden Terminal operation. If nobody would pay a liquidating New Haven for the right to lose money, the right is, again,

---

[66] The parties have devoted much discussion to Penn Central's negotiations with the States of New York and Connecticut for the transfer of the New Haven commuter service to a public authority. Manufacturers Hanover says the States have agreed to pay an annual toll to run the trains into the Terminal, thus demonstrating that the New Haven right of access does have value; Penn Central claims the States are to pay only for the use of the tracks and that it will give them a right of entry into the Terminal for nothing. Both sides point to newspaper articles in support of their arguments. None of this is record evidence, and we do not consider it.

worthless. The Commission found that the only potential buyer would be the State of New York, moving to preserve the commuter service in the public interest. 334 I. C. C., at 32. Whether the State would have to pay *Penn Central* for the use of Penn Central's tracks and its share of Terminal expenses is not before us. On the liquidation hypothesis, the State would not have to pay Penn Central for New Haven's right of access, for Penn Central would not own it. And the State's paying *New Haven* depends on at least four independent contingencies: whether New Haven's right of access would survive liquidation; whether the right would exclude the power of Central to bestow a similar access right on a third party while New Haven's own went unused; whether, under the agreement with Central, the right would be capable of assignment; and whether the State, if required to pay New Haven anything to enter the Terminal, would choose instead to operate the commuter trains only to subway connections in the Bronx rather than all the way into Manhattan. We agree with the Commission and the reorganization court that these imponderables render the value of New Haven's right of access so speculative as to defy reasoned attribution of any value to it.

2. *The Bronx freight yards.* One of New Haven's principal real estate holdings consisted of two freight yards located on some 160 acres in the south Bronx, New York, between the East River on the one side and the Major Deegan Expressway and Bruckner Boulevard on the other. The Harlem River yard occupies nearly 4,000,000 square feet across the East River from Manhattan and Queens; it has been described by a qualified appraiser as "a unique industrial facility that could be well used by any heavy industrial concern." About a mile north of the Harlem River yard, and connected to it by the existing trackage of New Haven's Harlem Division

line, lies the Oak Point yard, characterized by the appraiser as "one of the most desirable industrial facilities in New York City."

Two other facilities in the area are worthy of note. The first is the Hunts Point Market, located northeast of the Oak Point yard. The market is a $100,000,000 municipal installation and the central distribution area for the wholesaling of produce for the New York City metropolitan area. It lies on the promontory flanked by the Bronx and East Rivers, and is connected to the New Haven's Harlem Division line through a spur track owned by the city. The market is the largest receiver of rail traffic in the area, and plans are under way for further expansion. *Fourth Supplemental Report,* 334 I. C. C., at 43–44. The second facility is the former Port Morris yard of Penn Central, situated midway between the Harlem River and Oak Point yards and lying athwart the Harlem Division trackage that connects the two New Haven yards. Port Morris is linked by a branch line to Penn Central's Harlem Branch division, a principal element in the Penn Central System. An interchange track runs from the Port Morris branch line to the border of the Oak Point yard.

Before the Commission, the parties submitted five different estimates of the value of the Harlem River and Oak Point yards. The bondholders offered the testimony of an appraiser who thought the land would bring $32,000,000 for residential use and $26,000,000 for industrial use; the New Haven trustees offered the testimony of another appraiser who submitted two studies showing $22,650,000 and $18,090,990, both for industrial use; and Penn Central, that of a third appraiser who set the value, again for industrial use, at $15,585,000. In its Second Supplemental Report the Commission accepted the lower of the values proposed by the trustees' witness—$18,090,-990. 331 I. C. C., at 668.

On the first round of judicial review the reorganization court thought that on the present record "there was substantial evidence to support the Commission's valuation and not enough to show that it was unfair or inequitable," but concluded that a clarification of the basis of the Commission's valuation was desirable. 289 F. Supp., at 464. On the remand, controversy centered on the alternative appraisals offered by the trustees' witness. It soon became evident that in valuing the freight yards the Commission had pursued the liquidation hypothesis with a vengeance. The higher appraisal of the trustees' witness had rested on the premise that upon cessation of New Haven operations the Bronx yards would be available for continued industrial occupancy, with existing trackage and electrical facilities left in place. The presence of such facilities commanded at least a 10% premium in Bronx realty values. The witness' second appraisal had assumed that upon liquidation New Haven would strip the yards of these facilities, thereby depressing the value of the land and incurring substantial costs of removal. 334 I. C. C., at 42. Adoption of that assumption resulted in the loss of over $4,000,000 in value.[67]

---

[67] "An example of the difference in approach in the trustees' two appraisals is afforded by the so-called REA Building in the Harlem River yard. This building was specially built for REA Express with four tracks running through the center of its ground floor. In the first, and higher, trustee appraisal the building was valued at $675,000 because of these tracks and the railroad service they provided. In the second, and lower appraisal, it was assumed that the tracks were dismantled. This would require reconstruction of the ground floor. The building would then be suitable only for an entirely different type of tenant. Without tracks, it would have a lower rental value. Its appraised value was, therefore, reduced to $400,000 in the second appraisal. Differences in the values of various other tenant-occupied buildings in the two yards resulted from following similar procedures in their appraisals." 334 I. C. C., at 43. (Footnote omitted.)

454

In its Fourth Supplemental Report the Commission adhered to its acceptance of the lower of the witness' two estimates, reiterating its reliance upon the liquidation premise. That premise justified the assumption that New Haven would dismantle the yards once the rest of the railroad was scrapped, since with no link to Penn Central the yards would have no value either as operating facilities or for industrial use with railroad connections.

But the fact of the matter was that even on the liquidation hypothesis the New Haven yards did *not* lack rail connections to Penn Central. Penn Central already had in place a branch line running from its Port Morris yard to its Harlem Branch division. That Port Morris line, along with the interchange track running up to the border of the Oak Point yard and meeting the New Haven's line at that point, would have continued in place even upon a liquidation of New Haven. The trustees' witness acknowledged that in arriving at the lower of his two values for the New Haven yards, he had been unaware of the Penn Central link at Port Morris. Nevertheless, the Commission attributed no significance to the witness' unawareness of the Port Morris connection, because it concluded that even with the existing link to the New Haven yards, it was "extremely doubtful" that Penn Central would continue to provide service into the area after a New Haven liquidation. Once New Haven vanished, the Commission reasoned, Penn Central would be under no legal obligation to perform switching service beyond its own Port Morris line or to extend its line into the former New Haven yards. And the Commission accepted the testimony of a Penn Central witness that the company would have no economic incentive to provide service, because of the unprofitability of the perishable freight destined for the Hunts Point Market, as well as the absence of necessary track clearances and yard classifying facilities. 334 I. C. C., at 44–45.

On the second round of review the reorganization court ruled that the Commission had erred in rejecting the higher of the witness' two appraisals. "It is undisputed that the Port Morris branch was and is there and operating and Penn Central has not been authorized to abandon it." 304 F. Supp., at 807. The court overruled the Commission's determination that Penn Central would cease to provide service not only to the industrial enterprises in the 160-acre area of the two yards, but to the Hunts Point Market as well.

> "The great bulk of produce for feeding of the millions of residents of metropolitan New York is brought in by rail through these yards to this market and distribution point. To assume that the State and City of New York would stand idly by and permit the life line to its huge and costly enterprise to be cut, just as it is in the midst of planning its necessary enlargement, because it was unwilling or unable effectively to bring pressures to bear or take steps on its own to preserve the connection with Penn Central is absurd . . . ." 304 F. Supp., at 807–808.

The ruling of the reorganization court is, at the least, free from the error that would require us to overturn its judgment on this matter. As the Commission's own report makes evident, the agency based its startling conclusion that Penn Central could deny service to the area, not on the facts of record, but in adherence to the untenable assumption that on liquidation New Haven would have uprooted the valuable trackage and electrical facilities already in place. According to the Commission, "[t]he record does not support any finding of substantial need for Penn Central service that would justify the construction by that carrier of the trackage necessary to connect Harlem River and Oak Point yards

and the latter yard and Hunts Point, *if N[ew] H[aven] were to be liquidated."* 334 I. C. C., at 47. (Emphasis supplied.) Of course we may assume that Penn Central could not be forced to buy land and build track to provide service into areas, noncontiguous to its rail system, to which it did not hold itself out as a common carrier. But it is a far cry from that proposition to the statement that a common carrier could deny service to industrial and public activities simply because ownership of adjoining trackage had changed hands.[68] The record facts are that the trackage the Commission said Penn Central would have to construct is already in place, connecting the two yards and the market.[69] The Commission nonetheless continued to presuppose the removal of the New Haven's rail facilities. "On this record," the Commission reiterated, *"and the assumption of N[ew] H[aven]'s liquidation and the dismantling of its system,* Penn Central would not serve, and could not be compelled to serve, the Harlem River or Oak Point industries, or the Hunts Point Market." 334 I. C. C., at 47. (Emphasis supplied.) There is not a shred of record evidence to support the Commission's assumption as applied to the New Haven yards. It is not rational

---

[68] Under the Interstate Commerce Act, Penn Central is obliged to "provide and furnish transportation upon reasonable request therefor," § 1 (4), 49 U. S. C. § 1 (4), and to offer switch connections and cars for traffic to branch lines or private side track constructed by shippers to connect with the railroad wherever practicable and justified by the added business, § 1 (9), 49 U. S. C. § 1 (9).

[69] Penn Central claims it could not provide service to the yards over the Port Morris branch because of clearance difficulties on the line. The reorganization court observed that Penn Central's own evidence largely refuted the contention. This finding of the District Court, based on its study of the record and its intimate familiarity with the subject matter, is free from clear error, and we do not disturb it.

to suppose that the managers of the hypothetical liquidation sale, devoted to obtaining the highest possible price for the assets of the debtor, would have ignored the best use of the yard facilities and stripped them of more than $4,000,000 in value.[70]

3. *The added deductions.* On the remand the Commission recalculated the liquidation value of the New Haven, as directed by the reorganization court, and arrived at a new sum of $162,700,000. "A property value of this sort inheres in the assets," the Commission said, "if we assume that the railroad may immediately shut down and begin a 6-year program of selling off the road parcel-by-parcel, and virtually tie-by-tie." 334 I. C. C., at 53. But the Commission declined to approve the new figure as the proper liquidation value of the debtor.

"The liquidation value that results in this reopened proceeding exceeds the agreed price [of $125,000,000], obliging us to make a new determi-

---

[70] Penn Central's own witnesses conceded the Port Morris connection would "doubtless" enable the industries at Harlem River and Oak Point to continue their rail usage even after a New Haven liquidation; that someone, whether the City of New York or a third party, would have to acquire access for rail service to the Hunts Point Market; and that the only rational way to provide such service would be to move cars from the Penn Central system via the Port Morris connection. The Commission itself found that during a test month in the summer of 1968 more than 2,300 cars passed from the Penn Central main lines to the market and yard industries via the Port Morris connection. 334 I. C. C., at 44.

At one point Penn Central claimed that even on the higher of the two appraisals, the record evidence required a downward adjustment of $461,000. The reorganization court made a partial correction to reflect a conceded duplication, but implicitly rejected Penn Central's argument as to the balance. Since Penn Central does not press the issue here, we do not consider it.

nation as to whether the price resulting from such a valuation is fair.

"The establishment of liquidation value as a pricing floor on this record must assume that the N[ew] H[aven] may be shut down at once and be liquidated in parcels. Such a pricing theory assumes that the public may be denied an opportunity to be heard. It is wholly inconsistent with the requirement we have imposed on Penn Central to absorb the N[ew] H[aven], which requirement rests entirely upon the public's need for a continuing N[ew] H[aven]. Any assumption that N[ew] H[aven] may be shut down and broken up must necessarily permit the conclusion that Penn Central may be relieved of its inclusion obligation. It is inequitable to conceive at the same time both a right in the bondholders to break up the N[ew] H[aven] and an obligation on Penn Central to keep it going. The demands of equity are no more satisfied by conceiving that the bondholders have a constitutional right to shut down the N[ew] H[aven] which is superior to the public's right to keep it going.

"The foregoing liquidation value assumes that this Commission has no function under the Interstate Commerce Act to decide whether public convenience and necessity permit the abandonment of N[ew] H[aven]'s entire line or portions of it. In view of our often repeated findings that there is a public need for the services of this railroad, there is no warrant for assuming that the creditors may now break up the railroad or devote the properties to another use. The estate is not relieved of its obligation to serve the public. A price that is premised on outright rejection of that obligation is inequitable

and awards the estate a windfall that is not supported by any record evidence." 334 I. C. C., at 54–55.

On the basis of this reasoning, the Commission then proceeded to take into account "other pricing considerations"—costs of liquidation it had not reached in its earlier report because of its conclusion that the $125,-000,000 price arrived at by the parties was proper under the Interstate Commerce and Bankruptcy Acts.

"The alleged right to liquidation values derives from an alleged right to abandon; and there are recognized limitations on the right to abandon that in themselves limit the creditors' entitlement to the liquidation value we have computed under the court's instructions. Under section 1 (18) of the Interstate Commerce Act, the Commission is empowered to impose reasonable limitations on the abandonment right." 334 I. C. C., at 57.

The Commission's new "pricing considerations" consisted of two elements: a one-year delay the New Haven would have incurred in securing the approval of the Commission and the courts to abandon train operations; and a bulk-sale discount that a purchaser of all the debtor's assets, to whom the Commission could order the road to sell, would have commanded. Together the added deductions amounted to $22,081,000.

(a) *The one-year delay.* The Commission found that an application for a certificate of abandonment, as required by § 1 (18) of the Interstate Commerce Act, would have precipitated a lengthy process of administrative action and judicial review resulting in at least a one-year delay in the commencement of actual liquidation operations. The Commission assumed that the year's delay would have occasioned a freeze on liquidation activity, following which the sell-off would have proceeded

as projected in the Second Supplemental Report. The abandonment delay, the Commission found, would have added costs of $4,940,000 in preserving the assets of the estate, $2,500,000 in real estate taxes, and $7,946,000 in a discount of the sale receipts back to present worth.

On review the reorganization court rejected the delay concept, ruling that the added deduction violated the liquidation hypothesis upon which the debtor's assets had been valued. Neither the parties nor the Commission had previously postulated the deduction now imposed, because the liquidation hypothesis itself had presupposed a lawful abandonment of service. 304 F. Supp., at 798. That presupposition was rooted in the hard fact that for more than three years prior to December 31, 1966, the New Haven had been kept alive, despite its hopeless financial condition, solely in the name of the public interest and in anticipation of inclusion in Penn Central.

"By late 1963 it was clear to the Trustees of the New Haven and to the Reorganization Court that only two courses were open: the Trustees must press to accomplish the inclusion in a Penn Central merger or they must press for liquidation. The former was obviously in the public interest and the latter was not. The course of inclusion was followed; but because the merger and the reorganization proceedings stretched out far beyond what was originally forecast, the 'interim' became seven and a half years; and 'losses reasonably incident to working out the solution most consistent with the public interest' eroded the debtor's estate in excess of $60 million.

.        .        .        .        .

"Like Laban of old, the Commission would now require further servitude of the debtor—in this case the creditors. But the duty of the debtor's creditors to suffer losses for an interim period has already

been fulfilled and the public interest has already been served to the extent that in fairness and equity the public had any right to demand." 304 F. Supp., at 800. (Footnote omitted.)

The Commission and Penn Central take issue with the reorganization court's disallowance of the deduction for delay. The dispute between them and the bondholders is not, however, broad in concept. It does not draw into question the right of the Commission to insist that New Haven obtain permission to abandon its operations: no one here quarrels with the proposition that in the event of a liquidation, New Haven would have been obliged to obtain a certificate from the Commission pursuant to § 1 (18) of the Interstate Commerce Act. The parties agree that since a delay occasioned by abandonment proceedings before the Commission, followed by judicial review, inheres in the liquidation process, the Commission may exercise its expertise in gauging the extent and expense of such a delay, and Penn Central need not pay for the consequent diminution in the value of the assets of the debtor. The dispute is, rather, a a narrow one. It is simply whether, in the circumstances of this case, the valuation initially arrived at by the Commission already presupposed that the debtor had a certificate of abandonment in hand, so that assignment of a cost attributable to that factor amounts to an unwarranted double deduction.

Before this Court the Commission and Penn Central urge the view that until the remand the Commission had not taken the delay factor into account. They justify the deduction on the second round as a development of the governing liquidation hypothesis adopted on the first. Once we enter the world of a liquidation that

never occurred, they say, the Commission is more competent than the courts to project incidental costs and delays. On the remand the Commission merely refined the liquidation approach to reflect added expenses not initially considered because of the fairness of the price arrived at by the parties. The new price ordered by the courts compelled re-examination of the elements of liquidation, of which abandonment delay is surely one. And when it comes to predicting the likelihood of delay in passing on an application for a certificate of abandonment, the Commission is, as Penn Central puts it, "a uniquely qualified finder of fact . . . ." [71]

At once the "refinement" rationale confronts an imposing obstacle raised by the Commission's own Second Supplemental Report. That report makes clear that the Commission had the element of delay before it in making its original valuation, but declined to apply any deduction on its account. The Commission considered—and rejected—Penn Central's request "that an allowance be made *to the earliest date at which a liquidation could reasonably be anticipated* for the constant diminution of N[ew] H[aven]'s assets." 331 I. C. C., at 698. (Emphasis supplied.) That rejection necessarily implied that the Commission had recognized the cost attributable to the delay occasioned by an abandonment proceeding, but determined not to weigh it in the balance. Thus we deal, not with a delay factor brought to light for the first time on the second round, but with one taken into ac-

---

[71] The Commission itself justified the refusal of the hearing examiner to take evidence on the question of delay by saying: "To the extent that evidence was proffered on the processing time of possible abandonment proceedings involving N[ew] H[aven], such matters are within our knowledge and evidence thereon was unnecessary." 334 I. C. C., at 29.

count now even though deliberately excluded before. Justification, if any there be, must begin with the realization that the Commission changed its mind in midstream.

The reorganization court rejected the Commission's conclusion that the valuation date selected in the Second Supplemental Report—December 31, 1966—represented the date on which New Haven would have sought a certificate of abandonment rather than the date on which the railroad would have commenced its six-year sale. In doing so, the court relied on more than the Commission's shift in position between its second and fourth reports. The court rested on its express finding of fact that "but for the adoption by the Trustees of a course to serve the public interest, abandonment proceedings could and would have been commenced in late 1963 and liquidation would have been started, certainly by the valuation date of December 31, 1966." 304 F. Supp., at 801. That finding comes to us from the federal judge who has presided over the second New Haven reorganization since its inception. "In view of the district judge's familiarity with the reorganization, this finding has especial weight with us." *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.*, 328 U. S. 495, 533. Not only are we unable to say the finding is erroneous; we do not see how the record of these proceedings permits any other conclusion.

Indeed, the Commission and Penn Central do not challenge that conclusion. Instead, they seek support for the delay deduction by urging that if confronted with an abandonment application, the Commission would have had to "hear the communities that would be affected by the abandonment. If there is hope of a public takeover of segments, we must allow time for the States and communities to present their plans." 334 I. C. C., at 58.

464

But apart from the fact that this Court itself once characterized the notion that the affected States or the Federal Government might take over the road and its operations as "sheer speculation," *Penn-Central Merger Cases,* 389 U. S., at 507, the reorganization court specifically rejected the Commission's argument.

"During seven and one-half years, the Federal government, the states, the communities and the public in general were fully informed by the Trustees of the Railroad as to the inability of the New Haven to survive as an independent railroad. And, apart from seeking inclusion in a merged Penn Central, the Trustees were engaging in a holding operation to afford the public bodies, as the real guardians of the public interest, the opportunity to act—to take over or adopt measures to preserve the New Haven transportation system. Response to this was partial tax assistance and, in the latter half of the period, grants which covered about ⅓ of the annual passenger losses. . . . Otherwise nothing has come to the attention of this court, to indicate anything more than a highly speculative prospect, that any or all of the states concerned or their municipalities had the slightest interest in taking over and operating the New Haven or any segment of it.

"In spite of full awareness of the situation of the bankrupt line and with nothing to prevent their doing so, no standby legislation, for use if inclusion of the New Haven by Penn Central fell through, was ever enacted or sought to be passed in seven and one-half years by the Federal Government or by any of the states for the take over and operation of the New Haven freight and passenger system or a segment of it (except for the west-end and the Boston commuter services); nor was any plan ever

filed by the governmental bodies incorporating such take over and operation." 304 F. Supp., at 800–801.[72]

---

[72] These findings comport with the observations of the reorganization court in February 1965, when the trustees sought permission to discontinue all passenger service:

"The record shows that the public interest has been thus far supported by the creditors of this estate with no substantial participation from the states. . . .

.     .     .     .     .

"Far from being indifferent to the public interest, the court has indulged that interest and allowed it to prevail over the creditors' rights for three and one-half years.

"In spite of this long interval, very little has been produced. Massachusetts never fulfilled its commitment to grant tax relief. New York, by conditioning future tax relief on a commitment by the Trustees to lease new equipment and conduct commutation service at present levels with no assurance that the deficits would be underwritten, has used it as a lash over the back of the debtor to compel it to do the State's will at a time when it has not had the strength to do so. Tax relief in Connecticut and Rhode Island was continued, but with a requirement that certain standards of service be met and, accordingly, that the passenger deficits continue to be incurred.

"If the public interest so urgently demands the continuance of the New Haven's passenger service, as the States seem suddenly to have discovered, they should have stopped taxing its property a long time ago. Commuters and other passengers demand better equipment and better service; the States insist upon imposing a continuing tax burden—everyone wants to draw the last ounces of blood out of this near corpse; but no one gives it the transfusion it so badly needs. It is now too late in the day to talk about saving the situation with tax relief. As the Railroad has not been able to use its vital cash for taxes, liens have been accumulating ahead of the creditors, forcing them further down the ladder of priorities, and accelerating and compelling the action which the court has taken today. If this tax burden continues to grow and the Railroad is not otherwise relieved, the creditors will be compelled to move for liquidation of the New Haven and the court will have no recourse but to order it. If the states wish essential passenger services continued, an underwriting which goes far beyond tax relief will be necessary."

We think the reorganization court was entirely correct in concluding that:

"The policy of imposing an interim burden of losses, through its deficit operation, on a railroad in reorganization is to afford a reasonable opportunity to the responsible agencies to arrange the continuation of the railroad's operation, but the law does not require the furnishing of two or three or four opportunities. The duty was more than amply fulfilled by the New Haven. The public interest has had one huge bite of the apple; it is not entitled to another." 304 F. Supp., at 801.

It is argued that the Commission nonetheless should be permitted to tax New Haven with the cost of a one-year delay because in fact the debtor sought no abandonment certificate from the Commission. The Commission and Penn Central attribute this failure to New Haven's self-interest. "The fact is," the Commission said, "that both the creditors and the trustees exercised options, assuming the risks involved therein, and the bondholders may not now be heard to ascribe to someone else the responsibility for the selection of their course of action, or inaction." 334 I. C. C., at 58. (Footnote omitted.) But the continued operation of the New Haven as a railroad depleted the estate by at least $60,000,000. 304 F. Supp., at 800. We fail to see how the self-interest of either the estate or its creditors was bettered by that operation.

Nor is there any substance to the contention that by failing to press for immediate liquidation of the debtor, the bondholders somehow waived their right to object to the imposition of the deduction for delay. The record that shows the preservation of New Haven in the public interest long after it had ceased to be viable as an independent enterprise demonstrates at the most that the bondholders had resigned themselves to bearing the costs

of interim operations pending inclusion in Penn Central. It contains no support for the proposition that they consented to the imposition of more than $15,000,000 in *hypothetical* costs on top of the tens of millions in *actual* costs they were forced to bear. As the reorganization court put it, "[S]uch a second round of loss superimposed on the first, like Pelion on Ossa, is as unfair and inequitable as can be imagined . . . ." 304 F. Supp., at 801. It cannot be sustained under any construction of the Bankruptcy Act.[73]

---

[73] What we have said disposes of the deduction for delay on the ground advanced by the reorganization court. Entirely apart from that explanation, a second line of reasoning leads to the same result. The delay deduction assumed the postponement of the commencement of liquidation for one year; the Commission postulated a one-year freeze prior to the beginning of sale. See 334 I. C. C., at 60 n. 2. But the Commission thereby assumed that during the one-year delay period nothing would happen; the trustees would sell no properties and enter into no contingent contracts for disposition of the debtor's assets. Absent Commission explanation, we cannot assume that the delay would have resulted in so total a suspension of the sales program during the first year, as well as a failure of the sale managers to expedite disposition of the properties and thereby shorten the contemplated six-year liquidation period. It is not for us to determine the extent to which imposition of a one-year pause at the outset would have enabled the trustees to accelerate the sale in the fifth and sixth years. But acceptance of the delay deduction in principle would compel a remand to the Commission for explanation of its tacit assumptions that the initial year would have been devoid of activity and the later years would merely have proceeded as before.

It is suggested that with the one-year freeze the delay concept may be viewed as a mere shifting of the valuation date to December 31, 1967. That date, it is said, is as rational as the date originally chosen. And so it may be. But the adjustments in value take into account only the expenses and depreciation attributable to a one-year pause, with no consideration to countervailing income and increases in capital value. The Commission says a comprehensive revaluation of the debtor's assets as of December 31, 1967, would produce a much greater loss than the $15,386,000

(b) *The bulk-sale discount.* New Haven's land hold-
ings consisted of over 25,000 acres located along its
rights-of-way in four States. In its Second Supplemental
Report the Commission accepted the New Haven trus-
tees' appraisal of the realty. The New Haven analysis
was prepared by the company's general real estate agent,
who relied in some instances on the studies of outside
appraisers. The agent drew on a fund of actual experi-
ence, for the New Haven had long had a real estate
department engaged in the disposition of nonoperating
properties. From the inception of the New Haven
trusteeship through November 1966, that department
had completed 853 separate realty sales for a gross con-
sideration of some $13,900,000. The Commission found
that the large volume of past sales provided a "firm
base" for the New Haven estimate. 331 I. C. C., at 667.

The New Haven agent assumed that the company
would sell off its lots in normal-sized parcels. He gave
specific consideration to each part of the railroad's prop-
erty and reached his values on a zone-by-zone basis. He
based his estimates of fair market value on his expert
judgment, sales in the area, existing tax valuations, and
the adaptability of the land to nonrailroad use. He dis-
counted by 50% whenever the New Haven's records
indicated questionable title; on the six-year liquidation

actually deducted. But in the absence of proof we again cannot
assume that that would be the case. For authority to that effect we
need look no further than to the Commission itself, which, as we have
earlier noted, rejected Penn Central's request on the first round for
a further allowance for the "constant diminution of N[ew] H[aven]'s
assets" to reflect the occurrence of abandonment delay. On that
occasion the Commission noted that "a large portion of N[ew]
H[aven] assets consists of land," and added: "We cannot assume
that these values will diminish. It is at least as reasonable to pre-
suppose that the values will increase." 331 I. C. C., at 698. If the
Commission could not assume diminution in realty values at the
time of the Second Supplemental Report, we do not see how, with-
out some explanation, it could assume it at the time of the Fourth.

hypothesis, he deducted $15,971,000 as the cost of operating the New Haven realty department; and on the further assumption that the debtor would have to sell some of the property during the final year at vastly reduced prices, he made a further deduction of $8,178,000.

On the remand, the Commission ordered a further deduction from the liquidation value of the estate, based on a hypothetical sale in bulk of all the New Haven's land assets.

> "The liquidation value urged by the creditors assumes not only the immediate right to abandon, . . . but also the right to break up the railroad and sell the parcels for their highest and best price. We think such a right may be restricted when a buyer for the entire bulk of the N[ew] H[aven] properterties appears who will continue the operation of needed services." 334 I. C. C., at 60. (Footnote omitted.)

The Commission calculated the deduction on the premise that "[t]he bulk-sale discount merely reflects a market appraisal of the risks that the estate avoids, and the bulk buyer assumes." *Id.*, at 61. The Commission then credited the evidence that Penn Central had presented through a realty expert with respect to a bulk sale of the New Haven land properties. The expert testified to the premium to be charged by a "single purchaser of property who would, in turn, sell off the property probably to many users and who would obtain his profit by reason of its purchase and resale." On the basis of this testimony, the Commission found that a bulk buyer would command at least a 10.5% return on his investment, calculated as the sum of a 75% borrowing at 9% and a 25% self-financing at an internal charge of 15%, and that such an investment rate required an additional 4.5% discount of the New Haven land values over and above the 6% by which they had already been

reduced. This bulk-sale discount resulted in a further diminution of $6,695,000 in the valuation of the New Haven assets. 334 I. C. C., at 61–62.

On the second round of review the reorganization court rejected the bulk-sale deduction as "improper and without support in law or reason." 304 F. Supp., at 805.

> "Value, under the circumstances of this case, can only be arrived at through the dismantling of the transportation plant and a piece by piece sale of the properties. It is clear from the record that a market existed for the disposition of the properties on this basis. Their value is the best price the market place will give the seller, less the costs and expenses relevant to the sale . . . . It makes no difference whether the purchaser wants to use the property as is, or to improve and develop it. The question is how much will the market place give for a particular item of property." *Ibid.*

The court answered the argument that the discount merely reflected the risk of nonsale that the seller transferred to the bulk buyer by pointing to the Commission's prior deduction of over $8,000,000 for that purpose. Moreover, the deduction violated the requirement that the sale price meet the "fair upset" minimum imposed by § 77 (b)(5) of the Bankruptcy Act. "That lowest price is what the market would pay, which is implicit in the standard used here, i. e., fair liquidation value. Neither a trustee nor an equity receiver could, with the court's approval, sell for less." 304 F. Supp., at 806.

Penn Central now protests that the reorganization court has erred in rejecting the bulk-sale discount. It says its expert witness duplicated no discounts previously taken; he proceeded on the basis of all previous deductions. In addition, it is argued, his analysis took into account the problem of market absorption caused by the

mass marketing of some 1,700 sale parcels and the risk of further depression of land values occasioned by cessation of New Haven's operations—factors not considered by New Haven's witness. The hypothetical bulk sale, Penn Central says, was merely a construct for quantifying the risks that New Haven itself would have assumed in undertaking the sale of its realty; it afforded a means to determine "the minimum rates of return necessary to attract capital to the business of owning and disposing of the New Haven's land." Penn Central insists that the bulk-sale analysis thus constituted a "pricing out" of an additional cost of liquidation; it was "simply an analytical device for approximating risks that would occur if the land were retailed over time as promptly as possible . . . ."

We may assume that Penn Central's "pricing out" theory is a rational one. But the record demonstrates that the Commission rejected it as insufficient to justify application of the bulk-sale theory. Penn Central's analysis, said the Commission,

> "overlooks what is necessarily the bondholders' position—namely that aside from principles of equity and fairness they have a fixed right to sell off N[ew] H[aven] in parcels, so that even a bulk buyer must pay the per-parcel price. Our answer is that we may compel the bulk sale and the bulk sale discount as a condition of an abandonment certificate, and, therefore, as a reduction of the present price.
> ". . . We . . . might compel N[ew] H[aven], if it filed for abandonment, to sell in bulk and thereby make a bulk sale price appropriate." 334 I. C. C., at 61.

The Commission thus ruled that only by assuming an actual buyer in bulk who would take over the New Haven properties for continued railroad operations could it compel the transfer of the real property at the re-

duced price. Far from setting forth a theory of compulsory transfer "completely independent" of a "pricing out" analysis, the Commission concluded that only its power to compel the sale of the real estate to a single buyer for continued operation justified the bulk-sale discount.

We do not consider whether the Commission could lawfully impose such a bulk-transfer obligation on a railroad in liquidation at the cost of reducing the per-parcel valuation of its assets.[74] For the record before us is devoid of evidence that a bulk buyer would agree to take over the New Haven properties for continued service at any price. When a railroad has a lengthy history of deficit operations with no prospect of improvement, and a consequent operating value of zero or even a negative figure, the Commission cannot rationally assume that a *deus ex machina* will emerge to spend millions for the opportunity to lose millions more.

Penn Central's witness gave no testimony in support of any such theory. He was a professional developer of real estate, not a railroad operator. And he testified to what extra charges *he* would levy, after all previous deductions for the costs and risks of sale, to assume the risk of nonsale as well as the entrepreneurial activity of retailing the realty parcels. His testimony established nothing more than that he would not undertake the task

---

[74] The Commission frequently requires an abandoning railroad to sell its properties in bulk to a party (typically a public authority) that will undertake continued operation of the service, but typically sets the sale price at "not less than net salvage value of the property sought to be acquired." See, *e. g., Rutland R. Corp. Abandonment,* 317 I. C. C. 393, 425; *Chicago N. S. & M. R. Abandonment,* 317 I. C. C. 191, 200, aff'd *sub nom. Illinois* v. *United States,* 213 F. Supp. 83, aff'd *per curiam,* 373 U. S. 378; *Fort Dodge, D. M. & S. R. Co. Abandonment,* 312 I. C. C. 708, 712; *Chicago A. & E. R. Corp. Abandonment,* 312 I. C. C. 533, 537; *Arkansas & O. R. Corp. Abandonment,* 312 I. C. C. 501, 505.

of per-parcel sales that New Haven had assumed unless the company paid him a handsome fee. The Commission could hardly have compelled the New Haven trustees to turn over the assets of the debtor to such an entrepreneur, who would, on his own testimony, have proceeded *himself* to do just what the Commission said it was empowered to forbid the bondholders to do—dismantle the estate, rid himself of railroad-connected assets, and devote his talents to the disposition of the realty.

4. *The discount of liquidation factors.* In its Second Supplemental Report the Commission accepted the projection offered by the New Haven trustees that they could substantially complete a liquidation sale in six years. 331 I. C. C., at 663. Accordingly, the Commission discounted the estimated receipts of sale over the six-year period to reflect their present value—a deduction of $17,563,000. *Id.,* at 661. It did not, however, discount the estimated *expenses* of liquidation, although these, too, were projected to occur over the six-year period. The reorganization court was of the view that if future receipts were to be discounted to present value, future expenses should likewise be. 289 F. Supp., at 461; cf. *id.,* at 427– 428. On the remand the Commission concurred. It noted that the parties were very close in their estimates of the proper discount, and it concluded that $3,800,000 represented the correct figure. *Fourth Supplemental Report,* 334 I. C. C., at 39–40.

On the second round of review the reorganization court observed that despite three valuation changes netting a $6,600,000 reduction in estimated worth, the Commission had failed to adjust the old, inapplicable discount figure. Accordingly, the court directed the Commission to file "a new formulation and computation of the discount for present value of the New Haven's liquidation proceeds, in accordance with generally recognized

accounting principles and based upon the changes made in valuation items through and including those stated in the present opinion." 304 F. Supp., at 810–811. The court added that the Commission could submit its new formulation and computation in the form of a letter or short brief, and afforded other parties in interest one week to file their comments, as well as any formulations and computations of their own, also in a letter or brief. In accordance with this directive of the court, the Commission submitted its new calculations, and the bondholders replied. In its order adjudging the price to be paid, the reorganization court ruled that "[t]he sum of $2,415,899 should be added to liquidation value inasmuch as it was improperly deducted in applying the discount to present value found by the Commission . . . ." 304 F. Supp. 1136, 1137.

In its brief before this Court the Bondholders Committee states that the reorganization court's directive resulted from the Commission's continued failure to calculate discounts back to present value with respect to four items, three of them to the detriment of New Haven and one to the detriment of Penn Central. The first is the $8,177,633 deducted as the cost of hypothetical forced sales of New Haven realty during the last years of the liquidation. The Commission could have treated the item either as part of the value of the unsold land and then written it off as a cost of sale, with a discount back to present value for both sides of the balance sheet, or as a wash to be eliminated in computing both receipts and expenses. In fact the Commission did neither: it included the figure on both sides of the books, but discounted back only in the asset column. The result, says the Committee, is an error of $2,066,488. A similar shortcoming in determining the liquidation values of road property, such as ties and rails, added another error of $1,474,057. Third, says the Committee, the Commission

erroneously spread the sale of certain realty over the full six-year period when the undisputed evidence showed that New Haven could sell the land in 12 to 18 months; this resulted in an overstatement of $118,000 in the discount attributable to the net proceeds. Finally, the Commission assumed that New Haven could sell off $47,121,400 in equipment, investments, and materials during the first year of the liquidation, but failed to spread the assumed receipts over the entirety of that year, with a consequent understatement of $1,372,646 in the applicable discount. A netting of the four items, together with an added correction of $130,000 made by the Commission, results in the $2,415,899 adjustment ordered by the reorganization court.

The Commission does not dispute that it made the errors as alleged by the Committee. Its sole reply is that the bondholders have waived their claims in this regard by failing to present them to the Commission. Penn Central concedes that "the first two errors asserted by the bondholders represent miscomputations" in Penn Central's favor. But it argues that the amount of the fourth error and the existence of the third were the subject of conflicting testimony before the Commission, and it joins in the Commission's contention that the bondholders have waived the right to a resolution in their favor by failing to press a timely objection before the Commission when the agency first made its alleged mistakes.

The record demonstrates that the bondholders have the better of this argument. It is undisputed that both the bondholders and Penn Central presented witnesses to the Commission on the remand who agreed that the Commission had erred in its discounts and who differed only in minor amounts. See *Fourth Supplemental Report,* 334 I. C. C., at 40. But the Commission simply bypassed the agreement, unpersuaded that it had erred

in its prior opinion. *Id.*, at n. 17. The bondholders then carried the persistent discounting error to the reorganization court on the second round and won corrective relief. The submission of proposed adjustments by way of a letter was not, as is suggested, an untimely filing of claims, but a proper presentation pursuant to the instruction of the court—an instruction made necessary by the Commission's failure to straighten out the discounts after two rounds of hearings and reports, with errors that the bondholders on one side and Penn Central on the other now frankly concede aggregate over $5,000,000. Of the four items advanced by the Committee, only the third is subject to any real doubt, and that $118,000 item can hardly be considered a substantial sum in the context of these cases. A further remand to the Commission to resolve the accuracy of such a figure would serve no useful purpose at this stage of the litigation. The reorganization court resolved the controversy in favor of the bondholders following extensive oral argument on the issue. We affirm its judgment on these issues as free from that degree of error that would require us to overturn its finding.

5. *The loan-loss formula.* In its Second Supplemental Report the Commission, projecting a three-year interim period between merger and inclusion and concluding that a short-term lease would not be appropriate, required Penn Central to extend $25,000,000 in loans to the New Haven in exchange for first-priority trustees' certificates. 331 I. C. C., at 702–706.[75] In addition, it ordered Penn Central to share in New Haven's operating losses to the extent of 100% in the first year, 50% in the sec-

---

[75] In its Fourth Supplemental Report the Commission provided for payment of the trustees' certificates by cancellation against the price adjustments provided for in the Purchase Agreement. 334 I. C. C., at 70.

ond, and 25% in the third, not to exceed $5,500,000 in any one year. *Id.*, at 718–719. On the first round of judicial review the sliding-scale aspect of the formula was disapproved as an improper deterrent to the bondholders' assertion of their legal rights, 289 F. Supp., at 444, pursuant to the suggestion of MR. JUSTICE DOUGLAS at an earlier stage of the proceedings, see *Penn-Central Merger Cases*, 389 U. S., at 557–558 (separate opinion), and on the remand the Commission abandoned it. 334 I. C. C., at 71–72.

The $5,500,000 annual ceiling derived from the assumption, based on calculations provided by the New Haven trustees and accepted by the Commission, that despite the massive cash drain in 1967, future annual New Haven operating losses would be unlikely to exceed $5,400,000 in succeeding years. 331 I. C. C., at 718–719. Coupled with the sliding-scale formula, the annual ceiling thus proposed that Penn Central absorb the entirety of New Haven's 1968 cash loss. On the first round the reorganization court expressed the opinion that even with the abrogation of the sliding scale, Penn Central's share of that loss "should be a substantial percentage." 289 F. Supp., at 464.

By the time the parties returned to the Commission on the remand, it was evident that the trustees' appraisal of their ability to contain the New Haven's deficits had been far too optimistic. From February through December 1968, the trustees had already drawn down $14,000,000 of the $25,000,000 loan that was supposed to last for three years; at that rate they would exhaust the loan in another six or seven months. 334 I. C. C., at 72. The cash loss was equally grim: the projected 1968 cash deficit stood at $15,672,000, with an estimated operating deficit of $8,200,000. Despite the $2,800,000 increase in the operating deficit over the trustees' initial prediction, the Commission adhered to its original ceiling and, pro-

rating over the 11-month period from merger to inclusion, required Penn Central to pay $5,000,000. 334 I. C. C., at 74. On the second round of review the reorganization court affirmed without discussion.

The bondholders now urge that Penn Central be required to bear the entire operating loss from merger to inclusion. New Haven incurred that loss as an independent entity, say the bondholders, only because it remained outside of Penn Central after the merger, at Penn Central's request and for Penn Central's convenience. It is urged that the Commission's ceiling was originally calculated to place the entire loss of the first year on Penn Central, and that the original intention should be carried out.[76]

Penn Central denies responsibility for the fact that inclusion took place some 11 months after merger rather than along with it, and puts the blame at the door of the bondholders for their litigious insistence upon working out the terms of inclusion prior to the event. It also notes that it has been obliged to take over New Haven less than a year after its own formation, rather than at a later point in the three-year period originally envisaged by the Commission.

---

[76] In addition, the bondholders contend the calculation of the operating loss upon which the formula is based is itself unfair. Chase Manhattan and the Committee say the calculation excludes items such as rent for leased roads and interest paid during bankruptcy, aggregating some $2,600,000. The Commission refused to include such items because it thought them "more nearly capital charges, that is, costs of providing the railroad plant . . . ." *Second Supplemental Report,* 331 I. C. C., at 718. Chase Manhattan attacks the Commission's ruling on the ground that New Haven paid out the monies in question in 1968 only because it had not yet been included in Penn Central. But the test for an operating loss as opposed to a capital charge is not whether a cash disbursement took place; the Commission could properly limit Penn Central's liability to the former category.

While the issue is not free from doubt, we cannot say the reorganization court committed error in letting the Commission's action stand. Without ascribing fault to any party, we note the unfairness to the bondholders in requiring them to bear whatever portion of the operating loss Penn Central does not pay due to the inability of Penn Central and the trustees to negotiate an interim lease. On the other hand, there is a countervailing unfairness to Penn Central in requiring it to bear the full burden of New Haven's losses while it lacked exclusive and assured control over the operations of the debtor. The $5,000,000 paid by Penn Central is no drop in the bucket; it amounts to 61% of the operating loss as figured by the Commission and nearly one-third of the entire cash loss for the interim period. In no sense did Penn Central's contribution represent a payment for assets received; on the liquidation hypothesis, the Commission could rationally have declined to require any payment at all. Chase Manhattan argues that "[e]ither there was no equitable obligation on the part of Penn Central to pay any of the New Haven loss during the period from the date of the Penn Central merger to the date of its acquisition of the New Haven assets or there was an obligation to pay the entire loss." We cannot agree that the Commission was obliged to adopt such an all-or-nothing approach. Under the circumstances, the Commission's final disposition represents a pragmatic compromise of the competing interests, and in the absence of a controlling contrary principle of law we do not disturb the reorganization court's acceptance of the Commission's judgment.

6. *New Haven investments.* The Bondholders Committee complains that New Haven has transferred its stock ownership in two concerns—the New York Connecting Railroad and the Railway Express Agency—with no value given in exchange. The Connecting Railroad

was owned jointly by New Haven and Penn Central on a 50–50 basis, *Fourth Supplemental Report,* 334 I. C. C., at 44 n. 20, and is now presumably a wholly owned subsidiary of the merged company. REA is owned by various railroads; at the time of inclusion New Haven held about 4.5% of the outstanding stock.

In both instances the Commission valued New Haven's investment interest on the liquidation hypothesis. A witness presented by the New Haven trustees, whose testimony the Commission accepted, stated that because of Connecting Railroad's $18,000,000 funded debt its stock would have no liquidation value whatever. As to the REA, he said that its stock would have little or no value because of pending litigation over a tender offer for the stock [77] as well as recent legislation increasing the permissible size and weight of parcel post packages. *Second Supplemental Report,* 331 I. C. C., at 678.

The Bondholders Committee does not attack the Commission's finding of zero value for the Connecting Railroad and REA stock. Instead, the Committee says that if the shares were worthless, the Commission erred in requiring their transfer to Penn Central. Were the stock to have had no value on the liquidation of New Haven, the Committee argues, the reorganization court would, in the absence of bids for the shares, have ordered their distribution to the creditors to do with as they pleased. Accordingly, the Committee calls for the return of the stock to New Haven.

The Committee's request overlooks the fact that even though the shares in question might be worthless to a New Haven undergoing liquidation, the Commission could nonetheless order their transfer on the ground of their value to an ongoing Penn Central required to take in New Haven as an operating entity. But entirely apart

---

[77] See *Denver & R. G. W. R. Co.* v. *United States,* 387 U. S. 485.

from that consideration, and without pausing to assess the correctness of the zero valuation placed on the stock, we agree with Penn Central that the Committee's request for the return of the stock is foreclosed by *res judicata*. For the Committee—as well as all the other bondholders—took no appeal from the order of the reorganization court directing the transfer of the New Haven assets subject to a later determination of value.[78]

7. *"Going-concern" value.* The bondholders urge that Penn Central should pay an added amount to reflect the "going-concern" value of the New Haven. This sum, it is stressed, would be calculated, not as an alternative to liquidation value, but as a supplement to it. Since it is universally agreed that the New Haven was a losing operation in the form in which Penn Central was obliged to take it over, the bondholders display considerable temerity in pressing for inclusion of what could prove, in an ultimate analysis, to be only a substantial negative figure.[79]

The Commission rejected the notion that the New Haven had a going-concern value over and above the liquidation value of its physical properties. In the Commission's view, the bondholders' estimate of $55,-075,000 for such intangibles as organizational costs was premised on the replacement of a defunct railroad and

---

[78] The Bondholders Committee raised the question in its petition for certiorari whether the reorganization court had erred in its assignment of zero value to the certificates of contingent beneficial interest issued in connection with the reorganization of the Boston & Providence Railroad. See 304 F. Supp., at 810. The Committee has not revived the issue in its brief, nor has it responded in its reply brief to the Government's contention that it has abandoned the claim. Accordingly, we do not consider the matter further.

[79] In 1968 the New Haven suffered an estimated operating deficit of $8,200,000. That figure, capitalized at 8%, amounts to more than $100,000,000.

overlooked the probability that no one would ever have rebuilt the New Haven in its present form. More fundamentally, the Commission correctly repudiated the claims based on going-concern value as antithetical to the liquidation hypothesis on which the appraisal of the New Haven's assets had proceeded. As the Commission said, "It is not realistic to assume that a potential buyer would pay the liquidated value of the N[ew] H[aven] assets and then pay additional amounts representing elements of going concern value in the face of N[ew] H[aven]'s past deficit operations and its bleak prospects for the future." *Second Supplemental Report,* 331 I. C. C., at 686–687.

The Bondholders Committee concedes that the intangible assets in fact acquired by Penn Central "would be worthless to the New Haven in an assumed liquidation . . . ." That is enough to end the matter. The bondholders are not entitled to treat the New Haven as a liquidating enterprise with respect to certain items and as an operating railroad with respect to others, depending on which approach happens to yield the higher value. Nothing could be more unfair or inequitable to Penn Central than to permit the New Haven bondholders, at its expense, to have the best of both worlds.[80]

---

[80] The decisions of the New York state courts relied upon by the bondholders are inapposite. In *In re City of New York,* 18 N. Y. 2d 212, 219 N. E. 2d 410, appeal dismissed *sub nom. Fifth Avenue Coach Lines* v. *City of New York,* 386 U. S. 778, the city had condemned the Fifth Avenue Coach lines. The trial court treated the takeover as one of a going concern and fixed the award at reproduction cost new less depreciation. The Court of Appeals agreed that since Fifth Avenue had demonstrated a capacity for profitable operations under reasonable rates, it was entitled to going-concern value, but that the trial court had erred in excluding evidence of value of the "intangible going concern assets, that is, the component of value in the business which in addition to the value of the tangible assets reflects an efficient operation." *Id.,* at 220, 221, 219 N. E. 2d,

8. *The "underwriting" plan for the Penn Central stock.*
Thus far we have considered the disputes over the valu-
ation of the New Haven assets transferred to Penn Cen-
tral. We now reach the one issue raised in connection
with the consideration given by Penn Central in ex-
change. The Purchase Agreement negotiated by Penn-
sylvania and New York Central on the one side and the
New Haven trustees on the other provided that Penn
Central should pay in part for the New Haven properties
with 950,000 shares of its common stock.[81]  As a New
Haven trustee stated, "[O]ne of the principles for which
we negotiated at considerable length was that the bulk of

---

at 412, 413. The opinion of the Court of Appeals does not disclose
whether payment of liquidating value would have yielded a higher
price. In *In re Port Authority Trans-Hudson Corp.*, 20 N. Y. 2d
457, 231 N. E. 2d 734, cert. denied *sub nom. Port Authority Trans-
Hudson Corp.* v. *Hudson Rapid Tubes Corp.*, 390 U. S. 1002, the
Court of Appeals dealt with a public taking of railroad tunnels
under the Hudson River owned by a company in reorganization
and having only a "dim financial future . . . ." 20 N. Y. 2d, at
465, 231 N. E. 2d, at 736. The tunnels, which required only
$88,000 to be put in working order, had cost $32,000,000 to build,
and would have cost $400,000,000 to replace; their liquidating
value was a negative figure, because of costs that would have been
incurred in plugging them up. *Id.*, at 467 and n. 2, 470, 231
N. E. 2d, at 737 and n. 2, 739. Because the Port Authority was
taking the tunnels for continued operation, the Court of Appeals
held the proper valuation was depreciated original cost plus the
value of intangible assets also attributable to the operation as a
going concern. *Id.*, at 471–472, 231 N. E. 2d, at 740. In neither
of these cases did the New York courts require the taking authori-
ties to pay *both* an operating and a liquidating value. Rather,
they awarded the owners the value reflecting the highest and best
price for their properties—precisely the treatment accorded the New
Haven here.

[81] At the time of the Second Supplemental Report, an issue of
950,000 Penn Central common shares to New Haven would have
given the debtor 4% of the total shareholder equity in the new
company. 331 I. C. C., at 689.

the consideration should be in the form of common stock or, failing that, should be debt instruments having either conversion rights or options which would permit the claimants to the New Haven's Estate to participate in the benefits of the merger." In confirming the terms of the agreement, the Commission accepted the testimony of a New Haven trustee that the value of the stock could range anywhere from $75 to $100 a share on the date of closing and that the average, $87.50, represented his estimate of market value at the time of inclusion. 331 I. C. C., at 688–689. The Commission adopted the $87.50 per share value placed on the Penn Central stock by the trustee as reasonable. *Id.*, at 689–690.

On the first round of review the reorganization court agreed that the $87.50 per share figure represented a fair value for the Penn Central stock, based on the Commission's calculation of the estimated future earning power of the new company and the testimony of the New Haven trustee, "a well qualified expert." The court saw "no reason why recent fluctuations in the market value of these shares should change the disposition of the matter . . . ." 289 F. Supp., at 462.

On the remand, the bondholders challenged the Commission's stock valuation. The Commission cursorily rejected the attack on the ground that the bondholders' witness was unfamiliar with Penn Central's operating and financial plans, gave undue weight to extraordinary past expenses, and generally neglected the future prospects of the company. 334 I. C. C., at 68 n. 40.

By the time of the second round of judicial review, inclusion had taken place and the Penn Central had given its consideration in exchange. The bondholders, renewing their charge that the Commission's prophecy had been erroneous, pointed to the actual market performance of the stock. As of the inclusion date, December 31, 1968, the market price stood at 63⅜, more than

20 points below the Commission's estimated value. If that date should be thought suspect because of year-end sell-offs, the bondholders noted that throughout 1968 the price had fluctuated between 53½ and 86½, with a mean price between February 1 and December 31 of 69½. Thus, the bondholders contended, the primary component of their bundle of consideration had turned out to be worth anywhere from $17,000,000 to $23,000,000 less than it was supposed to be.

On the second round the reorganization court rejected the bondholders' contention that the Commission had predicted an $87.50 value as of the closing date.

> "[T]he Commission, presumably in an effort to assure fairness to Penn Central, did not use the market value of December 31, 1966 or an average of the values at or about December 31, 1968, the actual date of transfer. Instead, it adopted the theory that, after all, the purpose of using stock in payment was to tap the expected future economic benefit of the Penn Central merger which would come to full fruition seven to ten years after its effective date on February 1, 1968, but would be reflected in an upward trend of the stock at the time of closing or transfer of New Haven's assets to Penn Central, then estimated to be in 1970.
>
> .    .    .    .    .
>
> "[T]he theory of giving recognition to an intrinsic value in the shares, which will be realized when the full economic benefits of the merger have been achieved, not only assists the Penn Central by relieving it of the need to divest itself of a crippling amount of cash, which would be prejudicial to its merger program, but affords the New Haven an opportunity to participate in probable future profits." 304 F. Supp., at 808–809.

The court nonetheless recognized an element of unfairness to the New Haven bondholders in that the New Haven was compelled to accept the stock "at a substantial present loss on an assurance of future gain." As the court put it, "The nub of the unfairness and inequity is not the 87½ fixed for present calculations, but the fact that the purchaser is getting assets of sure present value while the seller is asked to gamble for its payment on the future of the Penn Central." *Id.,* at 809. The court concluded that this did not necessitate a change in price or an amendment to the valuations postulated by the Commission. "To be fair and equitable, however, it does require a supplemental provision fulfilling the implicit promise by the purchaser to pay $83.1 million as part of the price for the assets conveyed." Accordingly, the court provided that

> "if at any time the market price of Penn Central common shares reaches and maintains 87½ per share on the New York Stock Exchange for a period of five consecutive days on which the Exchange is open and doing business (not counting days on which the Exchange is closed to trading) between the date of final consummation of the plan. of reorganization and February 1, 1978, then and in that event it will be conclusively presumed that Penn Central has, in transferring the shares to the New Haven, made payment of the $83.1 million of the purchase price represented by the shares. If, however, the common shares of Penn Central do not reach and maintain the price as aforesaid, then the value of the shares will be determined by the average of the means between high and low prices of Penn Central shares on the New York Stock Exchange for the 30 business days next preceding February 1, 1978, on which the Exchange is actually operating and there are

sales of Penn Central shares. Penn Central will forthwith become liable to pay in cash to the New Haven, or its successor or successors, the difference between said mean market prices of those 30 days and 87½ for each share . . . ." 304 F. Supp., at 809–810.

The court provided that the benefit of Penn Central's underwriting of any difference between the mean market price and 87½ would inure only to the New Haven and would not follow the shares into the hands of third-party buyers.

In addition, the court afforded Penn Central the option of relieving itself of the 1978 underwriting obligation in the following manner:

"The Penn Central is granted an option, operative between the date of final consummation of the plan and February 1, 1978, to discharge its obligation to underwrite and pay the difference between such average market price and the higher 87½ at the end of the ten year period by paying on one or more blocks of 50,000 shares to the New Haven . . . the difference between the mean market prices for sales of Penn Central common shares and 87½ per share as of a specific day of sales on the Exchange which shall previously have been designated by Penn Central in a written notice delivered to the New Haven at least 5 days prior to such market date." *Id.,* at 810.

The underwriting plan of the reorganization court thus combined a series of essential findings and protective features. First, it ratified the Commission's determination that intrinsic value rather than market price should guide the appraisal of the worth of the Penn Central common stock; second, it predicted that that intrinsic value would be reflected in a market price of at least

$87.50 per share by the time Penn Central fully realized the benefits of its merger; third, it provided that Penn Central would secure the New Haven estate against the risk that the market price of its stock would not reflect that minimum intrinsic value within the first nine years after inclusion; and fourth, it contemplated that New Haven would be left free to participate in whatever future appreciations in value Penn Central's stock might enjoy. In sum, the reorganization court devised a plan that added to its assessment of present worth both a reasonable assurance of realization of such worth and the opportunity of additional gain. In so doing, the reorganization court in effect determined that postponement of immediate realization of $87.50 per share was offset by the possibility of even greater future market price of the stock, and that the package constituted fair compensation for the assets transferred to Penn Central.

On the basis of the record before the District Court at the time of its order, we would have no hesitancy in accepting its findings, conclusions, and proposed underwriting plan as consistent with the history of the reorganization proceedings and supported by substantial evidence. But we cannot avoid the impact of recent events in assessing the propriety of the decree that that court has entered. See *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 445. And those events make it possible that this aspect of the reorganization court's decree may be wholly unrealistic.

The fairness and equity that are the essence of a § 77 proceeding forbid our approval of a payment for the transferred New Haven properties that may be worth only a fraction of its purported value. And the same considerations of fairness and equity prevent imposing on Penn Central the burden of immediate payment in full, particularly when it is remembered that the New Haven bondholders have never objected to the receipt

of Penn Central stock in exchange for the New Haven assets.

Accordingly, we set aside the order of the Connecticut District Court insofar as it determines that an intrinsic value of $87.50 inheres in the Penn Central common stock and implements an underwriting plan to secure payment of that sum. Further proceedings before the Commission and the appropriate federal courts will be necessary to determine the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central.

## V

We turn finally to the contention of the bondholders that quite apart from the specific items that together go to make up the price to be paid for the New Haven assets, the plan of reorganization itself is not only unfair and inequitable under the Bankruptcy Act but violates the Fifth Amendment as a taking of property without just compensation.

The purchase price that the Commission and the reorganization court have required Penn Central to pay to the New Haven estate is based upon the liquidation value of the seller's assets, appraised as of December 31, 1966. That price hypothesizes a shutdown of New Haven followed by a sell-off of its assets at their highest and best value. In the circumstances of this case, and for the reasons we have already set out at length, we agree with the reorganization court that it would be unfair and inequitable to allow Penn Central to take the properties for any lesser sum. Moreover, we today require a reassessment of the consideration that Penn Central is to give in exchange for those properties. We thereby accord the bondholders the right to a liquidation and a per-parcel sale that is theirs by virtue

of their mortgage liens. The Bankruptcy Act does not require that they be given more. Nor is it necessary to consider the bondholders' claim that anything less than full liquidation value would amount to an uncompensated taking in violation of the Fifth Amendment.

But the Bondholders Committee presses another Fifth Amendment argument. It points to the Commission's own finding that from the inception of the New Haven reorganization through 1968 the debtor's estate had amassed more than $70,000,000 in administrative and prebankruptcy claims that take priority over the bondholders' liens. *Fourth Supplemental Report*, 334 I. C. C., at 126. The reorganization court itself noted that " 'losses reasonably incident to working out the solution most consistent with the public interest' [have] eroded the debtor's estate in excess of $60 million." 304 F. Supp., at 800. (Footnote omitted.) Although the extent to which the ongoing deficit operation has impaired the bondholders' security is unclear, it is undeniable that the continued operation of the railroad into the late 1960's, together with the legal uncertainties engendered by the doubtful future of the company, have greatly depressed the value of the bondholders' interests. Cf. *Penn-Central Merger Cases*, 389 U. S., at 509.[82]

A § 77 reorganization court may not, of course, disregard a claim that injurious consequences will result to a secured creditor from the suspension of the right to enforce his lien against the property of a debtor. That claim, however, "presents a question addressed not to

---

[82] As previously noted, the holders of the Harlem River Division bonds have received satisfactory security by Penn Central's assumption of the mortgage. See n. 48, *supra*. We are informed that the right of the holders of the General Income bonds to participate in the reorganized company depends on the outcome of this litigation. The holders of the First and Refunding Mortgage bonds stand somewhere in between. See 289 F. Supp., at 442 n. 18.

the power of the court but to its discretion—a matter not subject to the interference of an appellate court unless such discretion be improvidently exercised." *Continental Illinois National Bank & Trust Co.* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648, 677. Here the reorganization court recognized its duties under the Bankruptcy Act and the Constitution. In August 1968 it ruled as follows:

> "In view of the history of this deficit operation from the time of the filing of the petition under § 77 and even before, the size of the losses, the long period of time necessarily involved in seeking to work out a solution, short of liquidation, through inclusion in the Penn-Central, the present condition of the Railroad and the rate of loss and out-flow of cash in the recent past and in the foreseeable future, this court finds that the continued erosion of the Debtor's estate from operational losses after the end of 1968 will clearly constitute a taking of the Debtor's property and consequently the interests of the bondholders, without just compensation. It is therefore constitutionally impermissible, and obviously no reorganization plan which calls for such a taking can be approved." 289 F. Supp., at 459.

We do not doubt that the time consumed in the course of the proceedings in the reorganization court has imposed a substantial loss upon the bondholders. But in the circumstances presented by this litigation we see no constitutional bar to that result. The rights of the bondholders are not absolute. As we have had occasion to say before, security holders

> "cannot be called upon to sacrifice their property so that a depression-proof railroad system might be created. But they invested their capital in a pub-

lic utility that does owe an obligation to the public. . . . [B]y their entry into a railroad enterprise, [they] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.,* 328 U. S. 495, 535–536.

Only two Terms ago, when we last considered the Penn Central merger, we quoted approvingly the Commission's statement that "[i]t is a fundamental aspect of our free enterprise economy that private persons assume the risks attached to their investments, and the N[ew] H[aven] creditors can expect no less because the N[ew] H[aven]'s properties are devoted to a public use." *Penn-Central Merger Cases,* 389 U. S., at 510. We added:

"While the rights of the bondholders are entitled to respect, they do not command Procrustean measures. They certainly do not dictate that rail operations vital to the Nation be jettisoned despite the availability of a feasible alternative. The public interest is not merely a pawn to be sacrificed for the strategic purposes or protection of a class of security holders . . . ." *Id.,* at 510–511.

In this context we appraise the bondholders' claim that the continued operation of the New Haven from the inception of the reorganization proceeding in 1961 to the inclusion in Penn Central in 1968 worked an unconstitutional taking of their property. There is no longer room for dispute that the bondholders will receive the highest and best price for the assets of the debtor as of December 31, 1966. That price of course reflects the depreciation of the properties and the losses incurred in the operation of the railroad from the commencement of reorganization proceedings under § 77 in the middle of 1961. But the Bondholders Committee does not tell

us what the depreciation and losses attributable to the prevaluation period are. Moreover, no bondholder formally petitioned the reorganization court to dismiss the proceedings and thereby permit a foreclosure on the mortgage liens until April 1967—well after the 1966 valuation date.[83]

Nor can Penn Central be held liable for the further decline in New Haven's value from the valuation date to the actual inclusion. The new company did not even come into existence until midway through that period, and from the point of its own creation until it took in the New Haven, it contributed substantially to recompense the debtor for its operating losses. Moreover, the failure of the bondholders to press for early liquidation of the New Haven meant that their initial application for a dismissal of the reorganization proceedings came just as the objective of salvaging the New Haven appeared possible to achieve. As the reorganization court noted, only two of the several bondholder groups made that initial application; it was not joined by the trustees, nor was it endorsed by other representatives of the bondholders and creditors; and it came just as the Commission was about to certify a feasible plan of reorganization to the court. "To jettison everything achieved and turn back just as a glimmer of light begins to show at the end of a long dark tunnel," said the court, "not only carries with it an aura of unreality but borders on the fantastic." *In re New York, N. H. & H. R. Co.*, 281 F. Supp., at 68.

On the other hand, we must also reject any lingering suggestion by Penn Central that the price it must pay for the New Haven assets is unfair in either a statutory or a constitutional sense. At first glance there is a

---

[83] As late as October 1966 the reorganization court noted that the policy of preserving the New Haven as an ongoing railroad "has been concurred in by the bondholders . . . ."

seeming anomaly in the requirement that Penn Central pay a liquidating value for property it must operate at a loss. But it is not correct to say that New Haven's right to liquidate is inconsistent with Penn Central's obligation to operate, or that if the New Haven's creditors had such a right, Penn Central must have it as well. The bondholders had the right by force of their state-created liens under the New Haven's mortgage obligations. Penn Central had no such right, because its merger was expressly conditioned on its assumption of responsibility for continued New Haven service. There was nothing inequitable in an arrangement that permitted the bondholders to recover the value of their liens on the property of the debtor at the same time that it required Penn Central to pay that value in exchange for the nearly $1,000,000,000 worth of benefits that the merger was then anticipated to produce.

As the Commission said at the time of its Second Supplemental Report, "Calling upon Penn-Central to pay more than the N[ew] H[aven] is worth as a going concern is not unreasonable within the meaning of section 5 (2). . . . The Penn-Central merger (which will bring substantial dollar savings to the merger applicants) was approved with the thought that some of the merger savings would be available specifically to ward off a liquidation and shutdown of the N[ew] H[aven] so that adequate transportation service would remain available to the public which now relies on the N[ew] H[aven]." 331 I. C. C., at 687–688.

The reorganization court made the point with clarity and force:

"The whole purpose of making the inclusion of the New Haven a condition of the merger was to require Penn-Central, which, in being permitted to merge, was granted the opportunity to realize tremendous economic benefits, to take over and operate

a helplessly sick but still needed railroad, which it could well afford to do. It is part of the price Penn-Central is called upon to pay for the right to merge. The right to merge was granted, the merger has taken place, and the price should be paid." 289 F. Supp., at 465–466.

For the reasons stated in this opinion, the judgment of the United States District Court for the District of Connecticut, reviewed on writs of certiorari in Nos. 914, 916, 920, 1038, and 1057, is affirmed in part and vacated and remanded in part. The judgment of the United States District Court for the Southern District of New York, appealed from in Nos. 915, 917, and 921, is vacated, and those cases are remanded with instructions to abstain pending the further proceedings before the Interstate Commerce Commission and the reviewing courts under § 77 of the Bankruptcy Act.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the decision of these cases.

MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN took no part in the consideration or decision of these cases.

MR. JUSTICE BLACK, with whom MR. JUSTICE HARLAN joins, dissenting.

The central issue in these cases, easily lost I fear in the 98-page opinion of the Court, can in my judgment be briefly and simply stated. After this Court's decision in the *Penn-Central Merger Cases,* 389 U. S. 486, the Interstate Commerce Commission assumed its difficult statutory task of determining the liquidation value of the assets of the New Haven Railroad, a determination which if upheld by the courts would decide the purchase price

Penn Central would have to pay for the bankrupt New Haven. The Commission made that valuation determination, and the question before this Court is whether, under the appropriate standards of court review, the Commission's valuation of the New Haven's properties should have been sustained or rejected by the reviewing courts. This question comes here from two federal district courts, both of which were called upon to review the Commission's valuation of the New Haven properties, (1) a bankruptcy court convened under § 77 of the Bankruptcy Act, 11 U. S. C. § 205, to consider the reorganization of the New Haven, and (2) a three-judge merger court convened under 28 U. S. C. §§ 1336 (a), 2321–2325, to review the Commission's merger and inclusion orders. Both district courts had jurisdiction under these statutes to examine the Commission's valuation decisions. And the proper scope for each court's review was the same: were the Commission's findings supported by substantial evidence and consistent with applicable statutory requirements? Yet the reception the Commission's determination received from the two courts on the final round of review was dramatically different. The bankruptcy court took issue with several of the Commission's important findings as to the New Haven's liquidation value and, substituting its own ideas of the proper method of appraising the railroad's properties, increased by over $28,000,000 the value the Commission had placed on the assets of the New Haven. 304 F. Supp. 793. In sharp contrast, the three-judge merger court noted the "severe limitations" on the scope of its review of valuation matters, 305 F. Supp. 1049, 1053, and, after carefully examining the Commission plan, sustained the agency's determinations.[1] Judge Friendly, writing for the three-

---

[1] The three-judge merger court corrected the Commission's findings on minor valuation points which are not relevant here. The Commission has subsequently made findings consistent with the three-judge court opinion on these questions. 334 I. C. C. 528.

judge merger court, stated the fundamental reason for that court's disagreement with the bankruptcy court:

"Essentially, we think our disagreements . . . reflect a difference in view concerning how far we are at liberty to substitute our own notions for the decisions the Commission has taken in what we regard as a sincere effort to comply with the tasks both courts assigned it on remand." 305 F. Supp., at 1065.

I

Both district court decisions are now properly before this Court for our review, and, contrary to the position taken by the Court today, it is my view that the Court has an obligation to pass upon both those judgments, not just one. As the quoted passage from Judge Friendly's opinion for the three-judge merger court indicates, the answer to the question whether this Court should follow the three-judge court and sustain the Commission's valuation of the New Haven properties turns largely on the proper scope of judicial inquiry into the agency determination. Our previous cases make it clear that the scope of judicial review of the Commission's appraisal of such properties is narrowly limited to ensuring that the agency findings are supported by material evidence and consistent with statutory standards. The federal courts, this Court included, should defer whenever possible to Commission expertise on complex questions of valuation. It is my position, elaborated in what follows, that the application of this test to the record before the Commission in these cases can only lead to the conclusion that the Commission did not abuse its discretion in valuing the New Haven and, accordingly, that the three-judge court was correct in sustaining its determinations and the bankruptcy court wrong in rejecting them. The three-judge court's excellent opinion is, in my view, compelling support for the idea that a reasonable reviewing court exer-

cising the proper scope of review would find that the Commission acted wholly within its discretion. Moreover, I find myself in agreement with Judge Friendly that the bankruptcy court greatly exceeded its reviewing authority and in so doing improperly substituted its own views on valuation for those of the Commission.[2]

The Court today reaches conclusions completely at odds with those stated above and affirms the decision of the bankruptcy court. I do not think the Court could reach the result it does but for its mistaken assumption that the bankruptcy court was somehow the more appropriate of the two courts to review the Commission's valuation determinations and that, accordingly, the excellent opinion of the three-judge court could be simply ignored on the ground that that court should have abstained in favor of the bankruptcy court. Congress has granted jurisdiction to review the Commission findings to both courts under the peculiar circumstances presented in these cases, and the Court offers only make-weight arguments to support its holding that the three-judge court should have abstained from reaching the valuation questions. In my view, both courts were obligated to fulfill their statutory mandate to review the Commission's valuation findings, and this Court has an obligation to treat with equal dignity the decisions of each of those courts. For this reason I cannot agree that the Court is justified in proceeding as if Judge Friendly's opinion for the three-judge merger court simply did not exist.

---

[2] Of course, the bankruptcy court and the three-judge merger court agreed on many of the issues that were presented to them, some of which were questions of valuation and some of which were not. Apart from the question of the underwriting plan, *ante*, at 488–489, the Court today affirms both district courts on those issues on which both agreed, and I concur in that result. I differ with the Court, however, on its handling of all those questions of valuation over which the two district courts disagreed.

Nor can I accept the Court's position that in reviewing the conclusions of the bankruptcy court it should apply a standard of review that attaches great weight to the conclusions of that court rather than to those of the Commission. Our prior cases indicate that the correct rule is just the opposite. In sum, the Court first disposes of the three-judge court's opinion by assuming that that court should have abstained, and it then adopts a deferential posture toward the conclusions of the bankruptcy court. In so doing the Court clears the way for its affirmance of the bankruptcy court. The Court's approach and the result it reaches are intimately related, and I regret that I cannot agree with either.

## II

On the question of valuing the New Haven's assets, the tasks which the three-judge merger court and the bankruptcy court were called upon to perform in these cases were virtually identical, and for both courts that task was a narrowly circumscribed one. The statutes governing review in both courts provide the same flexible standard: under § 77(e) of the Bankruptcy Act the bankruptcy court was to determine if the terms for the sale of the New Haven's assets were "fair and equitable," and under §§ 5 (2)(b) and (d) of the Interstate Commerce Act the three-judge court was to ensure that the terms of the merger and inclusion were "just and reasonable" and "equitable." More important, our previous cases leave no doubt that the two district courts and, accordingly, this Court are permitted only a limited scope for their review of the Commission's valuation findings. In *Ecker* v. *Western Pacific R. Co.*, 318 U. S. 448, 472, this Court emphasized that under § 77 (e) of the Bankruptcy Act, "Valuation is a function limited to the Commission, without the necessity of approval

by the [bankruptcy] court." The Court elaborated its holding this way:

"The function of valuation thus left to the Commission is the determination of the worth of the property valued, whether stated in dollars, in securities or otherwise. One of the primary objects of the bill was the elimination of obstructive litigation on the issue of valuation and the form finally chosen approached as near to that position as seemed to the draftsmen legally possible. Judicial reexamination was not considered desirable . . . . The language chosen leaves to the Commission, we think, the determination of value without the necessity of a reexamination by the court, when that determination is reached with material evidence to support the conclusion and in accordance with legal standards." 318 U. S., at 472–473.

See also *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.,* 328 U. S. 495, 508–509; *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523, 536–542. These cases make it clear that Congress delegated the valuation function to the Commission and that the Commission's determinations can be reviewed by the federal courts under § 77 (e) only to determine whether they are supported by substantial evidence and conform to the applicable statutory standards.

The scope of review of the three-judge merger court under § 5 of the Interstate Commerce Act is virtually identical to that of the reorganization court under § 77. The function of the three-judge court is only to determine if the Commission's actions "are based upon substantial evidence and to guard against the possibility of gross error or unfairness." *Penn-Central Merger Cases,* 389 U. S. 486, 524. If a court finds the Com-

mission's "conclusions to be equitable and rational," it should not, as it seems to me this Court does today, "second-guess each step in the Commission's process of deliberation." *Ibid.*

The reasons compelling such judicial restraint lie not only in the accumulated expertise of the Commission but also in the inherent uncertainty of the valuation process itself. "An intelligent estimate of probable future values . . . , and even indeed of present ones, is at best an approximation. . . . There is left in every case a reasonable margin of fluctuation and uncertainty." *Dayton Power & Light Co.* v. *Public Utilities Comm'n,* 292 U. S. 290, 310. These inevitable uncertainties of a complex valuation were greatly magnified in this case, for here the Commission was called upon to determine what values the New Haven properties would have, as the three-judge court put it, in "a liquidation that never happened, that in the world as we know it scarcely could have happened, and that, if it had happened, could have happened in any one of a number of equally imaginary ways . . . ." 305 F. Supp., at 1056. Given the extremely hypothetical context in which the Commission made its determinations, it is impossible for any reviewing court to know if the Commission's findings even approximated the true liquidation value of the railroad. Because of this enhanced uncertainty, the area in which the Commission was required to exercise its judgment in this case was unusually wide, and a reviewing court could properly upset its conclusions in only the clearest instances of abuse.

I indicated previously that when these criteria for judicial review are taken into account, it becomes impossible for me to believe that the Commission abused its discretion in deciding as it did the exceedingly complex and difficult valuation issues discussed at length in the Court's opinion. The three-judge merger court con-

cluded that the Commission's findings in this regard were supported by substantial evidence and consistent with relevant principles, and, after reviewing the record and the opinion of the Commission, I find myself in whole-hearted agreement with the three-judge court's conclusion. Judge Friendly's fine opinion leaves no doubt in my mind that the court for which he wrote was fully aware of both the limited scope of its reviewing power and also its obligation within those limits to scrutinize carefully each of the significant decisions of the Commission. Thus, the court assumed that "[i]f the Commission made demonstrable errors, it is our duty to correct these . . . ," but, unlike the Court today, it refused "to re-examine every judgment made by the Commission and to substitute our own whenever we think it better." 305 F. Supp., at 1056. The three-judge court's opinion sets out fully and adequately the reasons why the Commission should be affirmed on each of the disputed points, and there is nothing to be gained from my repeating those reasons here.

### III

The Court's opinion affirming the bankruptcy court attempts to avoid the force of the foregoing considerations by first holding that the three-judge court should have abstained from reaching the valuation issue and then assuming for some reason which is not clear to me that this Court should apply a limited scope of review to the valuation findings of the bankruptcy court rather than to the Commission's findings. This approach is, I submit, premised on erroneous assumptions.

### A

There can be no question but that under relevant federal statutes both the three-judge merger court and the bankruptcy court had jurisdiction to review the Commission's determination of the New Haven's liqui-

dation value. See 11 U. S. C. § 205; 28 U. S. C. §§ 1336 (a), 2321–2325. The Court today does not really dispute this conclusion, but argues instead that the bankruptcy court might have had "primary jurisdiction" to decide the valuation issues, citing to support this idea several quite inapposite cases dealing with *in rem* jurisdiction, and, alternatively, that the three-judge court should have "abstained" because the only remaining issue was "the value to be accorded the assets transferred, and resolution of that issue was the essence of the § 77 process." *Ante,* at 428. Actually, the only "primary jurisdiction" involved here was the primary jurisdiction of the Commission to decide questions of valuation. Moreover, the question of the New Haven's value may well have been central to the § 77 proceedings, but, in ordering the New Haven's inclusion in Penn Central, the Commission exercised authority under both § 5 of the Interstate Commerce Act and § 77 of the Bankruptcy Act. The question of the New Haven's value was equally central to the requirement under § 5 that the Commission determine before issuing an inclusion order that the terms of the inclusion are "equitable." 49 U. S. C. § 5 (2)(d). Review of the Commission's valuation was therefore as appropriate on the merger and inclusion side as on the bankruptcy side, and the Court's argument to the contrary is completely conclusory. Accordingly, I think the three-judge merger court was correct when it decided that, "unfortunate as the duplicitous system of review may be, we see no basis on which we can properly decline to exercise the jurisdiction conferred upon us . . . ." 289 F. Supp. 418, 425.

### B

The Court also errs, I think, when it assumes that it should defer to the findings of the bankruptcy court rather than to those of the Commission. The reasoning

behind this novel approach is never clearly stated. At times, the Court seems to take the view that the proper role of the bankruptcy court on valuation questions lies somewhere between that of a trial court charged with the responsibility of making a fair estimate of the value of the New Haven properties and an appellate court whose responsibility is limited to reviewing the Commission's valuation. The adoption of this hybrid role for the bankruptcy court is strenuously urged upon us in some of the briefs in this case. Such a theory arguably justifies a deferential attitude on the part of this Court toward the reorganization court's determinations and also provides at least a partial justification for the bankruptcy court's *de novo* valuation estimates. However, the notion that the bankruptcy court has special powers in reviewing Commission valuations and in weighing the public interest is completely untenable in light of *Western Pacific* and the cases following it. Those cases make it clear that while the bankruptcy court does have certain special functions in § 77 reorganizations, the role of the bankruptcy court in the areas of concern here is simply that of an appellate court. As we said in *Reconstruction Finance Corp. v. Denver & R. G. W. R. Co.,* 328 U. S. 495, 508:

> "[T]he experience and judgment of the Commission must be relied upon for final determinations of value and of matters affecting the public interest, subject to judicial review to assure compliance with constitutional and statutory requirements."

To like effect was the conclusion reached in *Chicago, R. I. & P. R. Co.* v. *Fleming,* 157 F. 2d 241, 245, a case following *Western Pacific:*

> "[T]he Commission is allowed wide discretion in reaching its conclusions, and if its findings are supported by substantial evidence and follow

> legal standards they must be affirmed by the courts . . . ."

In my opinion these and other cases preclude the notion that the bankruptcy court has special factfinding and interest-weighing functions sufficient to justify this Court's viewing it as a quasi-trial court.

Alternatively, the majority's position might be that even though the reorganization court had no special review powers, this Court should still give great weight to its conclusions concerning the Commission's price determinations. This position might have some force were there grounds for confidence that the bankruptcy court in this case applied the correct scope of review in examining the Commission determinations, but no such grounds for confidence exist here. This Court has an obligation to examine carefully the opinion of the bankruptcy court to determine if that court did in fact apply the correct scope of review. Such an inquiry necessarily involves the Court in determining if the agency's decisions are consistent with applicable law and supported by substantial evidence. As I indicated earlier, the record in this case simply does not support the conclusion that the reorganization court stayed within its proper scope of review of the Commission determinations. Since the reorganization court applied the wrong reviewing standard, there is no justification for this Court's giving any deference to the valuation determinations of that court.

The Court's opinion is thus poised between two equally unsatisfactory alternatives. Its conclusions must either rest on the theory that the reorganization court has extraordinary reviewing powers, a theory which I think is precluded by *Western Pacific* and the cases which follow it, or the Court must take the position that the reorganization court correctly applied the *Western Pacific* standard, a conclusion which seems to me untenable in

light of the record in these cases and the opinion of the three-judge merger court.

## IV

Today's decision will have the effect of greatly burdening the Penn Central by increasing the amount that company owes to the New Haven bondholders by an additional $28,000,000. The imposition of this additional burden can only bring about a further deterioration of the Penn Central's already seriously compromised financial position [3] and will further reduce the ultimate chances of success of this venture in which the public has a considerable stake. The public interest in these cases certainly lies in establishing and maintaining the Penn Central as a viable private enterprise with reasonable rates and efficient services. Here the Commission had a duty "to plan reorganizations with an eye to the public interest as well as the private welfare of creditors and stockholders." *Reconstruction Finance Corp.* v. *Denver & R. G. W. R. Co.,* 328 U. S. 495, 535. See also the *Penn-Central Merger Cases,* 389 U. S. 486, 510–511. Because Penn Central's economic soundness will be vitally affected by the price it has to pay for the New Haven assets, the Commission had an obligation, which I think it fulfilled in these cases, to prevent an overvaluation of the New Haven assets which might unnecessarily jeopardize the newly merged Penn Central system. If the Commission resolved close and fairly debatable issues of valuation in favor of Penn Central rather than the New Haven bondholders, the agency's actions were wholly justifiable in terms of its statutory mandate to protect the public. Although the courts must review Commission determina-

---

[3] As the Court notes in a footnote to its opinion, *ante,* at 399, the Penn Central Transportation Company has filed a petition for reorganization under § 77 of the Bankruptcy Act in the United States District Court for the Eastern District of Pennsylvania.

tions of value to guarantee that those valuations are "fair and equitable" to the bondholders, that reviewing authority does not permit a court to substitute its views for those of the Commission. Judicial review of Commission valuations must be exercised in light of the fact that "Congress has entrusted the Commission, not the courts, with the responsibility of formulating a plan of reorganization which 'will be compatible with the public interest.' § 77 (d)." *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523, 544. Here the Commission struck a balance between public and private interests that was clearly within its discretion, and I think it is both improper and unwise for this Court to upset that balance and place an additional $28,000,000 burden on the Penn Central, a burden that I fear may ultimately be borne by the consumers of the Penn Central's services or by the Federal Treasury.

For the reasons stated above, I would affirm the judgment of the three-judge merger court on the valuation issue and would reverse the judgment of the bankruptcy court to the extent that it is inconsistent with the three-judge court.